**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| REX ALLEN FREDERICKSON, | |
| Plaintiff, | |
| v. | |
| DETECTIVE TIZOC LANDEROS, DETECTIVE SCARPETTA, OTHER UNIDENTIFIED OFFICERS OF THE JOLIET POLICE DEPARTMENT, DETECTIVE BRICK, TALBOT, AND OTHER UNIDENTIFIED OFFICERS OF THE BOLINGBROOK POLICE DEPARTMENT, | Case No. 11 CV 3484 <br><br> Judge Thomas M. Durkin <br><br> ORAL ARGUMENT REQUESTED |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO (I) DEFENDANTS DETECTIVE
BRICK, TALBOT AND THE VILLAGE OF BOLINGBROOK'S  AMENDED MOTION
FOR SUMMARY JUDGMENT ON ALL COUNTS OF THE THIRD AMENDED
COMPLAINT AND (II) JOLIET DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Mary Rose Alexander
Michael J. Faris
Johanna M. Spellman
Derek J. Linkous
Megan C. Fitzpatrick
Kate R. Elsner
Thomas H. Severson
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

February 8, 2017

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATUTORY SCHEME ...........................................................................................2

FACTUAL BACKGROUND .....................................................................................6

    A.   Landeros Takes Over Registration For The Joliet Police Department ...................6

    B.   Landeros's Issues With Frederickson Result In Multiple Arrests Of
Frederickson...........................................................................................................7

    C.   Following Repeated Arrests By Landeros, Frederickson Plans  To Leave
Joliet.......................................................................................................................8

    D.   Frederickson's February 9, 2011 Registration In Bolingbrook .............................9

    E.   Joliet Refuses To Transfer Frederickson's LEADS File To Bolingbrook..............9

    F.   Landeros And Talbot Conspire To Refuse Frederickson's Registration In
Bolingbrook ..........................................................................................................11

    G.   Frederickson's February 16, 2011 Registration.....................................................12

    H.   Frederickson's February 23, 2011 Registration.....................................................13

    I.   Frederickson's Registration Attempts On February 28, March 1, March 2,
And March 3, 2011 ...............................................................................................14

    J.   Frederickson's Grievances Against Landeros ......................................................14

LEGAL STANDARD .............................................................................................16

ARGUMENT ...........................................................................................................16

I.    FREDERICKSON HAS LEGAL AND FACTUAL SUPPORT FOR EACH
OF HIS CLAIMS ...........................................................................................16

    A.   By Denying Frederickson The Ability To Accurately Register, Defendants
Violated Frederickson's Constitutional Right To Procedural Due Process
(Count II) .............................................................................................................16

        1.   Frederickson Has A Recognized Liberty Interest In Being Able To
Register And Defendants Deprived Him Of That Interest........................17

        2.   Defendants' Excuses For Their Conduct Rely On Faulty Premises..........19

        3.   Complying With SORA's Requirement Of Providing "Accurate
Information" Is Also Protected By Procedural Due Process ....................20

    B.   By Intentionally Treating Frederickson Differently Than Similarly
Situated Offenders For No Rational Reason, Defendants Violated
Frederickson's Equal Protection Rights (Count III) ............................................21

        1.   Frederickson Has Similarly Situated Comparators...................................22

        2.   Defendants Treated Frederickson Differently ..........................................24

        3.   Defendants' Disparate Treatment of Frederickson Was Irrational ...........25

        4.      Defendants Exhibited Animus Towards Frederickson ..............................29

C.     Defendants' Refusal To Allow Frederickson To Register In Bolingbrook Violated His Right To Travel (Count I)...............................................30

D.     Defendants Conspired To Deprive Frederickson Of His Constitutional Rights (Counts IV And V) ....................................................................32

II.     **QUALIFIED IMMUNITY DOES NOT PROTECT DEFENDANTS' UNLAWFUL CONDUCT ......................................................................36**

A.     Reasonable Officials Should Have Known That Preventing Frederickson From Registering Violated His Constitutional Rights ...........................37

B.     Frederickson's Right To Be Treated In A Non-Arbitrary Manner Was Clearly Established In February 2011.................................................37

C.     Frederickson's Right To Travel To And Work In Bolingbrook Was Clearly Established In February 2011.................................................39

**CONCLUSION ........................................................................................40**

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................16, 22

*Ball v. Kotter*,
    723 F.3d 813 (7th Cir. 2013) ..............................................................................16

*Basta v. American Hotel Register Co.*,
    872 F. Supp. 2d 694 (N.D. Ill. 2012) ..............................................................24, 25

*Beley v. City of Chicago*,
    No. 12-cv-9714, 2015 WL 684519 (N.D. Ill. Feb. 17, 2015) ......................................... *passim*

*Brunson v. Murray*,
    843 F.3d 698 (7th Cir. 2016) ..............................................................18, 21, 23, 26

*Cairel v. Alderden*,
    821 F.3d 823 (7th Cir. 2016) ..............................................................................20

*CBS Outdoor, Inc. v. Village of Plainfield*,
    38 F. Supp. 3d 896 (N.D. Ill. 2014) ..............................................................................26

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................16, 27

*Del Marcelle v. Brown County Corp.*,
    680 F.3d 887 (7th Cir. 2012) ..............................................................22, 26, 29

*Derfus v. City of Chicago*,
    42 F. Supp. 3d 888 (N.D. Ill. 2014) ..............................................................17, 18, 37

*Dietchweiler v. Lucas*,
    827 F.3d 622 (7th Cir. 2016) ..............................................................16, 17

*Doe v. City of Lafayette*,
    377 F.3d 757 (7th Cir. 2004) ..............................................................30, 32, 40

*Dupuy v. Samuels*,
    397 F.3d 493 (7th Cir. 2005) ..............................................................................40

*Duran v. Sirgedas*,
    240 F. App'x 104 (7th Cir. 2007) ..............................................................................32

iii

*Estate of Escobedo v. Bender*,
  600 F.3d 770 (7th Cir. 2010) ...............................................................36, 37, 39

*Esmail v. Macrane*,
  53 F.3d 176 (7th Cir. 1995) ...........................................................................37

*Fares Pawn, LLC v. Indiana Department of Financial Institutions*,
  755 F.3d 839 (7th Cir. 2014) ..........................................................................21

*Geinosky v. City of Chicago*,
  675 F.3d 743 (7th Cir. 2012) ...............................................................21, 23, 38

*Hampton v. Hanrahan*,
  600 F.2d 600 (7th Cir. 1979 ...........................................................................33

*Harris N.A. v. Hershey*,
  711 F.3d 794 (7th Cir. 2013) ..........................................................................16

*Hill v. Galesburg Community Unit School District. 205*,
  346 Ill. App. 3d 515 (2004) .......................................................................35, 36

*Indianapolis Minority Contractors Association v. Wiley*,
  187 F.3d 743 (7th Cir. 1999) ..........................................................................34

*Jacobs v. City of Chicago*,
  215 F.3d 758 (7th Cir. 2000) ..........................................................................39

*Johnson v. City of Chicago*,
  No. 12-cv-8594, 2016 WL 5720388 (N.D. Ill. Sept. 30, 2016)...................... *passim*

*Johnson v. City of Cincinnati*,
  310 F.3d 484 (6th Cir. 2002) ...............................................................30, 31, 32, 39

*Krilich v. Village of South Holland*,
  No. 92 C 5285, 1994 WL 457227 (N.D. Ill. Aug. 19, 1994)................................33

*LaBella Winnetka, Inc. v. Village of Winnetka*,
  628 F.3d 937 (7th Cir. 2010) ..........................................................................22

*Matthews v. Eldridge*,
  424 U.S. 319 (1976)........................................................................................17

*McCready v. Title Servs. of Illinois, Inc.*,
  No. CIV.A.06 C 6280, 2008 WL 2435933 (N.D. Ill. June 16, 2008)........................24, 29, 30

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)........................................................................................30

*Memorial Hosp. v. Maricopa Cty.*,
415 U.S. 250 (1974) ..................................................................................30

*Muczynski v. Lieblick*,
No. 10-CV-0081, 2012 WL 5470738 (N.D. Ill. Nov. 8, 2012) ..............................23

*Olech v. Village of Willowbrook*,
160 F.3d 386 (7th Cir. 1998) ...................................................................37, 38, 39

*Palko v. State of Connecticut*,
302 U.S. 319 (1937)..................................................................................30

*Patrick v. City of Chicago*,
No. 14-CV-3658, 2016 WL 5792309 (N.D. Ill. Oct. 4, 2016) ..............................33

*People v. Frizzell*,
2013 IL App (4th) 120416-U ......................................................................4

*People v. Molnar*,
222 Ill. 2d 495 (2006) ........................................................................4, 19, 32

*People v. Wlecke*,
2014 IL App (1st) 112467..........................................................................3, 32

*Purvis v. Oest*,
614 F.3d 713 (7th Cir. 2010) ......................................................................36

*Ramos v. Town of Vernon*,
353 F.3d 171 (2d Cir. 2003)........................................................................39

*Reagins v. City of Chicago*,
No. 14-cv-9687, 2015 WL 3962279 (N.D. Ill. June 26, 2015)..............................17

*Saiger v. City of Chicago*,
37 F. Supp. 3d 979 (N.D. Ill. 2014) .........................................................17, 18, 37

*Schor v. City of Chicago*,
576 F.3d 775 (7th Cir. 2009) ....................................................................30, 39

*Spencer v. Casavilla*,
903 F.2d 171 (2d Cir. 1990)........................................................................30

*United States v. Funds in the Amount of $271,080*,
816 F.3d 903 (7th Cir. 2016) ............................................................... *passim*

*Van Meter v. Darien Park Dist.*,
207 Ill. 2d 359 (2003) ................................................................................35

v

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000) ...................................................................................................21

## STATUTES

730 ILCS 150/1 *et seq.* .......................................................................................... *passim*

730 ILCS 150/2 .............................................................................................................2

730 ILCS 150/3 .................................................................................................. *passim*

730 ILCS 150/6 ..............................................................................................3, 5, 20, 35

730 ILCS 150/8 ..................................................................................................4, 19, 35

730 ILCS 150/10 ..................................................................................................5, 21

## RULES

Fed. R. Civ. P. 56(a) ...............................................................................................16, 27

## OTHER AUTHORITIES

Andrew C. Porter, *Toward a Constitutional Analysis of the Right to Intrastate
    Travel*, 86 Nw. U. L. Rev. 820 (1992) .......................................................................39

Kathryn E. Wilhelm, *Freedom of Movement at a Standstill? Toward the
    Establishment of a Fundamental Right to Intrastate Travel*, 90 B.U. L. Rev.
    2461 (2010) ............................................................................................................40

## INTRODUCTION

Plaintiff Rex Allen Frederickson ("Frederickson") was homeless. Nevertheless, Frederickson dutifully registered as a sex offender week after week for nearly ten years in Joliet, Illinois as required under the Illinois Sex Offender Registration Act ("SORA"). For much of that period, he was regularly and repeatedly harassed by Joliet Detective Tizoc Landeros, who was the detective in charge of sex offender registration for the Joliet Police Department. When Frederickson told Landeros that he intended to leave Joliet, Landeros threatened that if Frederickson tried to do so, Landeros would arrest him. Finally, in February 2011, Frederickson got an opportunity to move away from Joliet and escape Landeros's harassment: he had a lead on a new job in Bolingbrook. Prompted by Landeros, however, the Defendants prevented Frederickson from registering in Bolingbrook. As a result, he was forced to return to Joliet and lost his job. By preventing Frederickson from registering as he was required to do under SORA, Defendants exposed Frederickson to potential arrest and prosecution. Their conduct was arbitrary, unreasonable, and violated Frederickson's constitutional rights of procedural due process, substantive due process, and equal protection under the Fourteenth Amendment.

In their motions for summary judgment, Defendants make several legal arguments to excuse their conduct—none of which find support in SORA or caselaw. *First*, the Bolingbrook Defendants argue that they could not register Frederickson once Joliet declined to transfer Frederickson's LEADS file, an offender-tracking system used by Illinois police departments. But SORA does not condition registration on inputting information into LEADS, as even Landeros acknowledges. As a result, the Bolingbrook Defendants cannot shift the blame. *Second*, the Joliet Defendants argue that their conduct was lawful because Frederickson did not "register out" of Joliet before he tried to register into Bolingbrook. The Joliet Defendants also misstate the law—SORA does not require that a sex offender register out of one jurisdiction

1

before he registers in a new jurisdiction.  *Third*, all Defendants argue that they are entitled to qualified immunity.  However, qualified immunity does not protect those who, like the Defendants, knowingly infringe on an individual's rights.

Viewing all of the evidence and drawing all reasonable inferences in the light most favorable to Frederickson, as this Court must, Frederickson has support for each of his claims. None of Defendants' excuses absolve their unconstitutional conduct.  A jury must decide whether Frederickson was deprived of his constitutional rights, and summary judgment should be denied.

## STATUTORY SCHEME

SORA, 730 ILCS 150/1 *et seq.*, serves a "critically important function" for law enforcement as it "enable[s officers] to monitor sex offenders."  Pl.'s Ex. P, Musgrove Expert Report ¶ 10; *see also* Joliet Ex. A, T. Landeros Dep. 67:5-68:13; Pl.'s Ex. C, M. Musgrove Dep. 46:1-9.  To accomplish this function, SORA imposes obligations on both the offender and the registering law enforcement agency.

SORA imposes a "duty to register" on certain individuals convicted of sexual offenses. 730 ILCS 150/3.[1]  SORA differentiates between those offenders who have a "fixed residence" (hereinafter, "Regular Offenders") and those "lacking a fixed residence" (hereinafter, "Homeless Offenders").[2]  *First*, SORA differentiates between the jurisdiction that the Offender needs to report to.  Regular Offenders are required to report to and register with the law enforcement

---

[1]     It is undisputed, for the purposes of these motions, that Frederickson is a "sexual predator" as that term is defined in 730 ILCS 150/2(E).

[2]     Any person, regardless of residence status, who is required to register under SORA is hereinafter referred to as an "Offender."

agency "in which he or she resides or is temporarily domiciled." 730 ILCS 150/3(a)(1)-(2).[3]

Homeless Offenders report and register not where they "reside" (as they, by definition, "lack[] a

fixed residence") but rather they report to the law enforcement agency where they are "located."

730 ILCS 150/3(a). *Second*, whereas Regular Offenders report annually, Homeless Offenders

"must report weekly, in person, to the appropriate law enforcement agency where the sex

offender is located." 730 ILCS 150/6; *see also* 730 ILCS 150/3(a) ("Any person who lacks a

fixed residence must report weekly, in person . . . ."). "The plain language of the Act therefore

requires a person who lacks a 'fixed residence,' to 'register' his address by simply reporting and

notifying the agency of jurisdiction that he lacks a 'fixed residence' and to report weekly

thereafter." *People v. Wlecke*, 2014 IL App (1st) 112467, ¶ 37.

Finally, for Homeless Offenders, SORA requires that the registering agency obtain

information from them about "all the locations where the person has stayed during the past 7

days." 730 ILCS 150/3(a). Nowhere, however, does SORA mandate that the registering agency

obtain nor the Offender provide information about where the Offender plans to stay during the

subsequent seven days. *See generally* 730 ILCS 150/1 *et seq.*

SORA mandates that an Offender "register in person and provide" the registering agency

with "accurate information." 730 ILCS 150/3(a). "Registration . . . shall consist of a statement

---

[3]      Importantly, the concept of where an Offender "resides" under SORA is defined broadly: "the
place of residence or temporary domicile is defined as any and all places where the sex offender resides
for an aggregate period of time of 3 or more days during any calendar year." 730 ILCS 150/3(a). In other
words, SORA anticipates Offenders having to register multiple addresses, potentially in multiple
jurisdictions. *See also id.* ("If the sex offender or sexual predator is employed at or attends an institution
of higher education, he or she shall ***also register*** with . . . ." (emphasis added)); *id.* ("The registration fees
shall only apply to the municipality or county of ***primary*** registration . . . ." (emphasis added)). For
example, "if [the Offender] ha[s] a sick aunt" and visits her "one Saturday every month, after the third
Saturday, [the Offender] must register that address, because it shows that [the Offender is] staying there."
*See* Joliet Ex. A, T. Landero Dep. 92:3-7. If the Offender resides in Evanston, but his hypothetical sick
aunt lives in Skokie, the Offender must register with law enforcement in both jurisdictions. *See* 730 ILCS
150/3(a).

in writing signed by the [Offender] giving the information that is required by the [Illinois] State Police."  730 ILCS 150/8; *see also* 730 ILCS 150/3(a); *accord People v. Molnar*, 222 Ill. 2d 495, 500 (2006) ("Registration as required by [SORA] consists of a statement in writing signed by the registrant providing the information required by the Department of State Police.").  The specific "information" that an Offender is required to provide to the registering agency includes a host of items such as "address," "place of employment," "telephone number," and "e-mail addresses," as well as any other "information . . . required by the [Illinois] State Police."  730 ILCS 150/3(a).  After an Offender provides the requisite written statement with the required information, the Offender's registration is complete.  *See* 730 ILCS 150/8.  As Defendant Landeros explained,

> a lot of people have a misconception about what the registration actually is . . . .  The registration form, . . . the one that they sign, that is their registration, okay?  That is them registering, ***not LEADS***, not software, not a Post-it.  ***That actual form is their registration***.  Whether it's processed through the [Illinois State Police] or not doesn't mean they're not registered.  It just means the [Illinois State Police] do[es]n't have the information yet.

Joliet Ex. A, T. Landeros Dep. 79:17-81:14 (emphases added); *accord* Pl.'s Ex. C, Musgrove Dep. 144:21-145:7, 146:18-147:5.  *See also* Joliet Defs. Local 56.1 Statement of Material Facts, Dkt. 209 (hereinafter "Joliet SOF") ¶ 20 ("The actual registration is the presentation of the form to law enforcement agency with jurisdiction.  It is then placed into LEADS for information purposes.").[4]  Because inputting information into LEADS is not required to complete registration, a registering agency does not need "ownership" of an Offender's LEADS file in order to complete the Offender's registration.

---

[4]    The receipt of the Offender's registration information, however, triggers separate obligations for the registering agency.  Specifically, the registering agency must (1) "forward" the Offender's registration "information" to Illinois State Police and (2) "enter the information into the Law Enforcement Agencies Data System (LEADS)."  730 ILCS 150/8; *see also Molnar*, 222 Ill. 2d at 500; *People v. Frizzell*, 2013 IL App (4th) 120416-U, at ¶ 5.

4

Independent of the duty to report and register in the normal course, SORA also requires Offenders to inform law enforcement of any change to an Offender's "residence address." *See* 730 ILCS 150/6; *see also, e.g.*, Joliet Ex. K, Pl.'s Feb. 2, 2011 SORA Registration Form at RF00000604. If an Offender's change of address causes him or her to have to register with a different jurisdiction, SORA prescribes that the Offender must both register in the jurisdiction covering his or her new address and register out from the "law enforcement agency with whom he or she last registered." *See* 730 ILCS 150/6. Both the registering in (with the new agency) and registering out (with the old agency) must occur within three days of the change of address. *See id.* SORA does ***not*** require that an Offender register out ***before*** he can register in with the new law enforcement agency. *See generally* 730 ILCS 150/1 *et seq.* That is, an Offender's registration with the new agency is ***not*** contingent upon the Offender having registered out with the old agency. They are independent obligations, both of which must occur within three days of the change.[5] *See* 730 ILCS 150/6; *see also, e.g.*, Joliet Ex. K, Pl.'s Feb. 2, 2011 SORA Registration Form at RF00000604.

SORA imposes "strict criminal liability" on anyone "who is required to register . . . who violates any of [its] provisions." 730 ILCS 150/10(a); *Johnson v. City of Chicago*, No. 12-cv-8594, 2016 WL 5720388, at *2 (N.D. Ill. Sept. 30, 2016). All violations of SORA are felonies and carry both statutorily mandated jail time and a fine. 730 ILCS 150/10(a).

---

[5]     Indeed, in the experience of Frederickson's expert, Michael Musgrove, the obligation to register out, while a "technical violation," is not often enforced. *See* Pl.'s Ex. C, M. Musgrove Dep. 191:10-193:13.

## FACTUAL BACKGROUND

Due to a past criminal conviction, Frederickson has registered as a sex offender pursuant to SORA since 2004. Plaintiff's 56.1 Statement Of Additional Material Facts In Opposition To Motions For Summary (hereinafter "Pl.'s SOAF") ¶ 1. From 2004 until February 2, 2011, Frederickson was located in and around Joliet, Illinois and was therefore required to register with the Joliet Police Department. Joliet SOF ¶ 3; Defs. Detective Brick, Talbot, and the Village of Bolingbrook's 56.1 Statement of Undisputed Material Facts in Support of their Amended Motion for Summary Judgment on All Counts of the Third Amended Complaint, Dkt. 183 (hereinafter "Bolingbrook SOF") ¶ 2.

From 2004 until 2007, the Joliet Police Department's sex offender registration department was run by Detective Moises Avila. Joliet SOF ¶ 8. For these three years, Avila did not have any issues registering Frederickson. Pl.'s SOAF ¶ 2. Occasionally, Frederickson would need to update information on his registration form (*e.g.*, change in employment). Pl.'s SOAF ¶ 3. Avila never refused to update Frederickson's registration form when Frederickson's relevant information changed. *Id.*

### A. Landeros Takes Over Registration For The Joliet Police Department

In 2007, Detective Tizoc Landeros replaced Avila as the detective in charge of sex offender registration at the Joliet Police Department. Joliet SOF ¶ 8. Landeros stated he had to "deal with [Frederickson] constantly" because Frederickson was "always questioning" his registration requirements.[6] Pl.'s SOAF ¶ 4. Beginning in 2008, Frederickson began requesting that Landeros update his registration form to reflect the correct name of his employer: Greg's Body Shop, not, as it had been inaccurately input, Greg's Auto Body. Pl.'s SOAF ¶ 5.

---

[6]     Landeros began harassing Frederickson and would not leave him alone. Pl.'s SOAF ¶ 4.

Frederickson also asked that the registration form reflect that he was employed as a contractor. *Id.*; *see also, e.g.*, Joliet Ex. H, Pl.'s Jan. 26, 2011 SORA Registration Form. Although Landeros knew that having inaccurate information on one's registration form is a violation of SORA and would subject Frederickson to possible arrest and prosecution, Pl.'s SOAF ¶ 6, Landeros refused to update Frederickson's registration form. Pl.'s SOAF ¶ 8.[7]

Because Frederickson recognized that Landeros's refusal to update his registration form subjected him to arrest under SORA for providing inaccurate information, Frederickson informed Landeros that he intended to leave Joliet. Pl.'s SOAF ¶ 9. In response, Landeros threatened Frederickson that if he ever attempted to leave Joliet, Landeros would arrest him. *Id.*

### B. Landeros's Issues With Frederickson Result In Multiple Arrests Of Frederickson

In 2008, Landeros decided to open an investigation into Frederickson's residency. Joliet SOF ¶¶ 48-53. Landeros interviewed Frederickson's co-workers at Greg's Body Shop and interviewed the managers of a motel where Frederickson had previously stayed. Joliet SOF ¶ 49. On May 16, 2008, Landeros arrested Frederickson and charged him for failure to register under SORA. Joliet SOF ¶ 48. Ultimately, Frederickson was acquitted of this charge but not before being forced to spend over a year in jail. Joliet SOF ¶ 53; Pl.'s SOAF ¶ 10.

On November 23, 2010, just as he had done each week since his acquittal, Frederickson reported at the Joliet Police Department to register. Pl.'s SOAF ¶ 11. While Frederickson was

---

[7]     It is also worth noting that Landeros's testimony at his deposition in this matter regarding whether he would update Frederickson's registration form directly contradicts the testimony he gave at Frederickson's 2011 trial for failure to register. *Compare* Joliet Ex. A, T. Landeros Dep. 169:14-20 (Q: Do you recall ever being asked by Frederickson to change information in his registration form? A: Yes. Q: Do you recall ever refusing to change information in his registration form at his request? A: Yes), *with* Joliet Ex. G, Trial Tr. at 24, *People v. Frederickson*, No. 11 CF 415 (Ill. Cir. Ct. – Will Cty. (12th Cir.) June 15, 2011) ("Q: Has Rex Frederickson ever asked you to change anything on the registration sheet? A: If he has ever asked me to change anything on his registration form it has been changed."). Pl.'s SOAF ¶ 8.

standing in the Joliet Police Department lobby, Landeros arrested him for driving on a suspended license. *Id.*; Joliet SOF ¶ 57. According to Landeros, he had seen Frederickson driving a week earlier, but did not make the arrest at the time because he wanted to handle some paperwork first. Pl.'s SOAF ¶ 12. In his deposition, Landeros admitted that this is the only time he has ever arrested someone for driving on a suspended license when that person was not driving. Pl.'s SOAF ¶ 13. Avila and another Joliet police officer, Paul Rodriguez, stated that they had never even heard of such a situation. *Id.*; Pl.'s Ex. D, P. Rodriguez Dep. 66:3-11 (Rodriguez testifying that he has made "maybe a hundred" arrests for driving on a suspended license but never when that person was not driving a vehicle.).

### C. Following Repeated Arrests By Landeros, Frederickson Plans To Leave Joliet

After two arrests within eighteen months at the hands of the same detective, Frederickson began looking for ways to leave Joliet. On January 26, 2011, Frederickson registered at the Joliet Police Department. Pl.'s SOAF ¶ 14. Again, Landeros refused to update his registration form to accurately reflect that he was working at Greg's Body Shop and that he was working as a contractor. *Id.* While registering, Frederickson told Landeros that he would be moving to Bolingbrook soon. *Id.* at ¶ 15. Landeros repeated his threat that he would arrest Frederickson if Frederickson attempted to leave Joliet. *Id.*

On February 2, 2011, Frederickson reported at the Joliet Police Department and again attempted to update his registration form with accurate employment information. Bolingbrook SOF ¶ 33; Pl.'s SOAF ¶ 16. Landeros was not present on February 2, 2011 so Frederickson registered with another Joliet police officer. Joliet SOF ¶ 75. The Joliet police officer refused to update Frederickson's registration form. Pl.'s SOAF ¶ 16. Because of Landeros's repeated threats to arrest Frederickson if he moved out of Joliet, Frederickson wrote "all rights reserved"

8

on his February 2, 2011 registration form in an effort to convey his continued desire to move out of Joliet (and to Bolingbrook) in the face of Landeros's threats to prevent him from doing so. Pl.'s SOAF ¶ 17.

### D.    Frederickson's February 9, 2011 Registration In Bolingbrook

On February 8, 2011, Frederickson submitted a job application to J&J Autobody, which was located in Bolingbrook.  Pl.'s SOAF ¶ 18.  Frederickson was subsequently given a "try out" at J&J Autobody.  *Id.*  With the new job offer in hand, Frederickson relocated to Bolingbrook. *Id.* at  ¶ 19.

On February 9, 2011, one week after his last registration in Joliet, Frederickson reported for the first time at the Bolingbrook Police Department to register.  *Id.*  Frederickson brought his February 2 registration form with him, and Bolingbrook Police Officer Nicholas Schmidt met with Frederickson and filled out Frederickson's registration form without incident.  *Id.* at  ¶ 20. Schmidt then gave Frederickson's registration form to Bolingbrook Police Officer Joseph Brick. Bolingbrook SOF ¶ 38.  Brick reviewed and approved Frederickson's February 9, 2011 registration form and turned it over to Bolingbrook Police Department's records department so that Frederickson's LEADS file could be updated.  Bolingbrook SOF ¶ 39.

### E.    Joliet Refuses To Transfer Frederickson's LEADS File To Bolingbrook

Bolingbrook Records Clerk Nicole Wlodarksi received Frederickson's February 9, 2011 registration form and attempted to update Frederickson's LEADS file to reflect that Frederickson had registered in Bolingbrook on February 9, 2011.  Bolingbrook SOF ¶¶ 38-39.  When Wlodarski attempted to access Frederickson's LEADS file, she discovered that the Joliet Police Department had not placed Frederickson's LEADS file into "moving status."  Bolingbrook SOF ¶ 40. Wlodarski contacted the Joliet Police Department to notify it that Frederickson had successfully registered in Bolingbrook and to request that the Joliet Police Department release

9

Frederickson's LEADS file. Pl.'s SOAF ¶ 21. The Joliet Police Department informed Wlodarski that they "knew" Frederickson was still living in Joliet and refused to release Frederickson's LEADS file. Pl.'s SOAF ¶ 23; Bolingbrook Ex. I, N. Wlodarski Dep. 65:17-66:1;[8] *see also* Pl.'s SOAF ¶ 24, citing Joliet Ex. G, Trial Tr. at 22, *People v. Frederickson*, No. 11 CF 415 (Ill. Cir. Ct. – Will Cty. (12th Cir.) June 15, 2011) (At Frederickson's 2011 trial, following Frederickson's March 3, 2011 arrest, Landeros testified that he "advised Bolingbrook that Rex Frederickson was a homeless sex offender employed in Joliet, and he belonged to – his LEADS file belonged to the Joliet Police Department.").[9]

Wlodarski estimated that on twenty occasions she has previously encountered a situation where an Offender registered in Bolingbrook while his or her LEADS file was still owned by a different jurisdiction. Pl.'s SOAF ¶ 26. In every single one of those instances, the previous jurisdiction placed the Offender's LEADS file into moving status upon her request.[10] *Id.* Although Frederickson legally registered on February 9, 2011, Wlodarski's inability to update Frederickson's LEADS file rendered Frederickson subject to arrest and investigation at any moment as Frederickson's LEADS file would make it appear that he was out of compliance with his SORA requirements and officers would have to detain Frederickson pending their investigation into whether Frederickson had properly completed his registration. Pl.'s SOAF ¶ 29.

---

[8]     Although Wlodarski stated that she could not recall who specifically she talked to at the Joliet Police Department, a handwritten note found on her desk "around the time that … [Frederickson] came into register" indicated that Landeros had tried to contact Wlodarski. Pl.'s SOAF ¶ 22; Bolingbrook Ex. I, N. Wlodarski Dep. 64:3-65:11; Pl.'s Ex. O, K. Teppel Memo to File (June 12, 2015).

[9]     At his deposition in this matter, Landeros no longer had any knowledge about the Joliet Police Department's failure to transfer Frederickson's LEADS file. Pl.'s SOAF ¶¶ 24-25.

[10]     Talbot also stated that he could not recall a single other instance where a police department refused to transfer ownership of a LEADS file. Pl.'s SOAF ¶ 28. As did Diane Kloepfer, who handled the transferring of LEADS file for the Bolingbrook Police Department for "most of" 19 years. *Id.*

### F.      Landeros And Talbot Conspire To Refuse Frederickson's Registration In Bolingbrook

At some point between Frederickson's February 9, 2011 registration in Bolingbrook and February 11, 2011, Landeros spoke to Detective Sean Talbot of the Bolingbrook Police Department.  Pl.'s SOAF ¶ 30.  Talbot recalls that Landeros informed him that Frederickson was trying to "pull the wool over [the Bolingbrook Police Department's] eyes, that "he was not going to be homeless in Bolingbrook" and that Landeros "was working on proving that he was actually living in Joliet."  *Id.* at ¶ 31; Bolingbrook Ex. C, S. Talbot Dep. 65:18-66:24.  At his deposition, however, Landeros admitted that had no reason to believe that Frederickson was not homeless in Bolingbrook during this time.[11]  Pl.'s SOAF ¶ 32.

After his conversation with Landeros, Talbot spoke with Pamela Dunning-Ganczewski, another records clerk at the Bolingbrook Police Department.  Pl.'s SOAF ¶ 33.  Dunning-Ganczewski then circulated an email to the Bolingbrook Police Department Records listserv that stated "[Talbot] came in on 2/11/11 and stated that Rex Frederickson will becoming [*sic*] in on 2/16/11 to do his sex offender registration again we will not take his registration due to the fact he lives in Joliet he is not homeless."  *Id.* at ¶ 34; Pl.'s Ex. J, Email from C. Gunty to all-police (Feb. 11, 2011).  Another Bolingbrook police officer, Sergeant Craig Gunty, then forwarded Dunning-Ganczewski's email to the entire Bolingbrook Police Department and added "JPD has alerted us to the fact that this guy doesn't want to pay their mandatory fee so he is going to try and scam us into doing it.  Per JPD don't register him here please."  Pl.'s SOAF ¶ 34; Pl.'s Ex. J, Email from C. Gunty to all-police (Feb. 11, 2011).  Schmidt stated that he understood this email

---

[11]      Landeros further stated that he doesn't "believe he mentioned anything about anybody trying to scam anybody."  Pl.'s SOAF ¶ 32; Joliet Ex. A, T. Landeros Dep. 229:6-21.

to mean that the Bolingbrook Police Department should not register Frederickson "no matter what."  Pl.'s SOAF ¶ 35; Bolingbrook Ex. M, N. Schmidt Dep. 46: 21-47:3.[12]

### G. Frederickson's February 16, 2011 Registration

During the week between February 9, 2011 and February 16, 2011, Frederickson worked at J&J Autobody on three or four different days and was in the process of moving his belongings from Joliet to Bolingbrook.  Pl.'s SOAF ¶ 36.  On the morning of February 16, 2011, Frederickson was located in Joliet picking up his tool cabinet.  *Id.* at ¶ 37.  Unsure whether he would be able to catch a ride to Bolingbrook later that day, Frederickson registered at the Joliet Police Department on the morning of February 16, 2011.  *Id.*  In the afternoon of February 16, 2011, Frederickson was able to catch a ride to Bolingbrook.  *Id.* at ¶ 38.  As Frederickson intended to work at J&J Autobody in the upcoming week, Frederickson reported to the Bolingbrook Police Department to register that afternoon.  *Id.*

Brick was called to meet with Frederickson.  Bolingbrook SOF ¶ 52.  Prior to meeting with Frederickson, Brick spoke to someone in the Bolingbrook Records Department about Frederickson.  Pl.'s SOAF ¶ 39.  Brick was reminded about the department email regarding Frederickson, *see supra* at 11, and concluded that the Bolingbrook Police Department could not register Frederickson.  Pl.'s SOAF ¶ 39.  Brick refused to register Frederickson without providing Frederickson with any reason and ordered Frederickson to return to Joliet.  *Id.* at ¶ 40.

---

[12]    Gunty stated that he "absolutely" expected that the Bolingbrook Police Department would comply with the request to refuse Frederickson's registration, without investigating Frederickson's information or verifying the veracity of the information that Landeros provided to Talbot.  Pl.'s SOAF ¶ 35; Bolingbrook Ex. J, C. Gunty Dep. 81:14-82:16.  Gunty also stated other than Frederickson he is not aware of any situation where the Bolingbrook Police Department was instructed to refuse to register an Offender.  Pl.'s SOAF ¶ 35.

Notably, the Bolingbrook Police Department (through its corporate representative) admitted that Frederickson is the *only* person whom Bolingbrook has *ever* refused to register.[13] *Id.* at ¶ 41.

### H. Frederickson's February 23, 2011 Registration

Between February 16, 2011 and February 23, 2011, Frederickson stayed in the cab of a friend's truck, which was parked in Bolingbrook. Pl.'s SOAF ¶ 43. Frederickson also worked three days at J&J Autobody. *Id.* On February 23, 2011 (seven days since his last registration in Joliet and seven days since Bolingbrook refused to register Frederickson), Frederickson reported in Bolingbrook for the third time to register. Bolingbrook SOF ¶ 55. This time, Frederickson was met by Talbot and Brick. Bolingbrook SOF ¶ 57; Pl.'s SOAF ¶ 44. Brick and Talbot wrongfully conditioned Frederickson's registration on whether Frederickson would provide locations where he planned on staying.[14] Pl.'s SOAF ¶ 44; Bolingbrook Ex. C, S. Talbot Dep. 91:20-93:11 ("I told him I would register him if he told me where he was going to be homeless in Bolingbrook, so that I could check."). Frederickson did not (and could not) provide such information. Pl.'s SOAF ¶ 46. Frederickson was unable to satisfy the Bolingbrook Defendants' demand, and true to their word, the Bolingbrook Defendants refused to register Frederickson on February 23, 2011 and, again, ordered him to return to Joliet. *Id.*

Frederickson then proceeded to the Bolingbrook Village Hall to file a complaint against Talbot and Brick. *Id.* at ¶ 47. While Frederickson was filling out the appropriate forms, the Bolingbrook village clerk received a phone call instructing her to refuse to help Frederickson

---

[13] Additionally, Avila, who was in charge of the Joliet Police Department's sex offender registration unit for over three years, could not think of a reason why he would refuse to register an Offender and could not recall any instance where he refused to update an Offender's registration form. Pl.'s SOAF ¶ 42; Joliet Ex. F, M. Avila Dep. 48:1-16 ("[I]f they're coming and giving me their information and that's what they want to put their signature to, that's what I do.")

[14] Brick acknowledged that there is nothing in the Bolingbrook Police Department's written polices about Offender registration that allows officers to refuse to register an Offender because that Homeless Offender would not indicate particular places he or she will be sleeping in the future. Pl'.s SOAF ¶ 45.

with his complaint.  *Id.* at ¶ 48.  Shortly there afterwards, a group of Bolingbrook police officers entered the Bolingbrook Village Hall and escorted Frederickson out of the premises, thereby preventing Frederickson from filing his grievance against Talbot and Brick.  *Id.* at ¶ 49.

### I. Frederickson's Registration Attempts On February 28, March 1, March 2, And March 3, 2011

His registration efforts in Bolingbrook having now been twice-refused, Frederickson was forced to inform J&J Autobody that he would not be able to continue working there until he could sort out his registration.  *Id.* at ¶ 50.  Frederickson had no choice but to return to Joliet and Landeros.  On February 28, 2011, Frederickson reported at the Joliet Police Department to register.  *Id.* at ¶ 51.  Frederickson met with Joliet Police Sergeant James Scarpetta (with whom Frederickson had been filing complaints against Landeros, *see infra*), but Scarpetta refused to take Frederickson's registration.  *Id.*  Frederickson reported at the Joliet Police Department each day on March 1, 2, and 3, 2011 in order to register.  *Id.* at ¶ 52.  And each time, Frederickson's efforts were refused.  *Id.*  On March 3, 2011, Frederickson was arrested and charged with failure to register.  Joliet SOF ¶ 102.

### J. Frederickson's Grievances Against Landeros

On February 7, 2011, after Landeros's repeated refusals to update Frederickson's registration form and his threats to arrest Frederickson should he leave Joliet, Frederickson contacted the Joliet Police Department to file a grievance against Landeros.  Pl.'s SOAF ¶ 53.  Frederickson complained that Landeros was refusing to update Frederickson's SORA form and unlawfully restraining Frederickson.  *Id.*  Scarpetta received Frederickson's grievance and it was his job to determine whether the conduct complained of constituted either a violation of the law or of Joliet Police Department policy.  *Id.* at ¶ 54.  In response to Frederickson's grievance, Scarpetta spoke to two supervisors within the Joliet Police Department about Frederickson,

reviewed the Joliet Police Department policy on Offender registration, and reviewed the SORA statute. *Id.* at ¶ 55. Scarpetta never once spoke to Landeros about the allegations in Frederickson's citizen complaint. *Id.* In fact, Scarpetta made the determination that Frederickson's grievance did not require any further investigation, without ever learning if refusing to update a registration form violated Joliet Police Department policy or the law or that Landeros had arrested Frederickson on two previous occasions. *Id.* at ¶ 56. Indeed, it was only hours after Frederickson re-submitted his formal written complaint against Landeros to Scarpetta that Frederickson was arrested on March 3, 2011. *Id.* at ¶ 57.

Scarpetta's investigation of Fredrickson's February 2011 citizen complaint stands in stark contrast to his investigation of another Offender's September 2012 complaint about Landeros. Pl.'s SOAF ¶ 58. That Offender, John Smith, complained that Landeros falsely arrested him. *Id.* In investigating Mr. Smith's complaint against Landeros, Scarpetta undertook the following actions:

- Obtained "incident reports" related to Mr. Smith;
- Obtained state police offender information on Mr. Smith;
- Called the Illinois Sex Offender Information Hotline;
- Called Mr. Smith to update him on the investigation;
- Sent Mr. Smith a "disposition letter"; and
- Interviewed Landeros about the allegations in Mr. Smith's complaint.

*Id.* at ¶ 59. Scarpetta did not undertake ***any*** of these actions in investigating Frederickson's complaint. *Id.* at ¶ 60.

Scarpetta explained one reason that he responded differently to Mr. Smith's complaint about Landeros was because "Mr. Smith's complaint [had] a sworn affidavit." *Id.* at ¶ 60. When Scarpetta was subsequently shown Frederickson's complaint, Scarpetta acknowledged that Frederickson's complaint contained sworn affidavits as well. *Id.* at ¶ 56.

## LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### I. FREDERICKSON HAS LEGAL AND FACTUAL SUPPORT FOR EACH OF HIS CLAIMS

#### A. By Denying Frederickson The Ability To Accurately Register, Defendants Violated Frederickson's Constitutional Right To Procedural Due Process (Count II)

 "To demonstrate a violation of procedural due process rights guaranteed by the Fourteenth Amendment, a plaintiff must establish (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). Neither the Joliet Defendants nor the Bolingbrook Defendants make any argument that the procedures employed were constitutionally adequate and instead argue that Frederickson was not deprived of any protectable interest. *See* Joliet Mot. at 11-15; Bolingbrook Mot. at 16-18. Their

16

arguments, however, contravene well established precedent, and their motions for summary

judgment must be denied as to Count II.

        1.    <u>Frederickson Has A Recognized Liberty Interest In Being Able To</u>
                <u>Register And Defendants Deprived Him Of That Interest</u>

Courts in this district have repeatedly recognized that a refusal to permit Offenders to

register as mandated by SORA "involves a protected liberty interest" because such a refusal

"jeopardizes their significant interest in freedom from liability and incarceration." *Beley v. City

of Chicago*, No. 12-cv-9714, 2015 WL 684519, at *2 (N.D. Ill. Feb. 17, 2015).[15]  Indeed, the

Joliet Defendants admit that "[h]omeless sex offenders have been found to have liberty interests

in being allowed to register under SORA."  Joliet Mot. at 12 (citing *Derfus v. City of Chicago*, 42

F. Supp. 3d 888, 899-900 (N.D. Ill. 2014); *Saiger v. City of Chicago*, 37 F. Supp. 3d 979, 984

(N.D. Ill. 2014)).[16]  Although the Joliet Defendants attempt to distinguish those cases, where the

Chicago Police Department refused to register sex offenders as homeless and instead tried to

refer them to shelters and have them register the shelter's address, their attempt falls flat.

After relocating from Joliet to Bolingbrook, Frederickson reported and registered with the

Bolingbrook Police Department on February 9, 2011.  *See supra* at 9.  Subsequently in the

course of trying to obtain ownership over Frederickson's LEADS file, Joliet's Landeros

communicated with Wlodarksi, Talbot, and Dunning-Ganczewski from Bolingbrook.  *See supra*

---

[15]     *See also, e.g.*, *Johnson v. City of Chicago*, 2016 WL 5720388, at *2 ("The strict criminal liability imposed by SORA for a failure to register implicates a liberty interest protected by the Due Process Clause."); *Reagins v. City of Chicago*, No. 14-cv-9687, 2015 WL 3962279, at *4 (N.D. Ill. June 26, 2015) ("Homeless sex offenders have an elemental liberty interest in avoiding liability and incarceration due to an inability to register.").

[16]     The Bolingbrook Defendants do not even engage with the cases holding that refusal to permit Offenders to register under SORA implicates a protected interest under the Due Process Clause. Presumably, this is because they proceed from the mistaken premise that a procedural due process claim requires a plaintiff to establish a "property interest."  *See* Bolingbrook Mot. at 16-17.  This is plainly incorrect:  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' **or** 'property' interests . . . ."  *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976) (emphasis added); *see Dietchweiler v. Lucas*, 827 F.3d at 627.

17

at 9-11. To be sure, the Joliet Defendants dispute that Landeros gave "instructions" to the Bolingbrook Defendants "on what Bolingbrook should do when [Frederickson] came in to register." Joliet SOF ¶ 95. But a contemporaneous email that was circulated to all Bolingbrook officers stated: "*Per JPD* don't register [Frederickson] here please." Pl.'s Ex. J, Email from C. Gunty (Feb. 11, 2011) (emphasis added); *see also supra* at 11. In light of this Court's obligation to "construe the evidence in the light reasonably most favorable to [Frederickson] and give [him] the benefit of all reasonable inferences from that evidence," *Brunson v. Murray*, 843 F.3d 698, 701 (7th Cir. 2016), this dispute is a genuine and material one that cannot be resolved by the court on summary judgment. *See, e.g.*, *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 909 (7th Cir. 2016).

Regardless of the extent of Landeros's involvement, it is undisputed that subsequently the Bolingbrook Defendants refused to process Frederickson's registration on February 16 or February 23, 2011, *see supra* at 12-13, despite the fact that he reported to the jurisdiction in which he was located as SORA requires. *See* 730 ILCS 150/3(a) ("Any person who lacks a fixed residence must report weekly, in person, with the sheriff's office of the county in which he or she is located in an unincorporated area, or with the chief of police in the municipality in which he or she is located."). In doing so, the Bolingbrook Defendants engaged in the same conduct as the defendants in other cases where courts in this district have found a protectable liberty interest: they turned Frederickson away without registering him and "jeopardize[d his] significant interest in freedom from liability and incarceration." *See Beley*, 2015 WL 684519, at *2. Just as the Chicago Police Department did with the offender-plaintiffs in *Saiger* and *Derfus*, Defendants provided Frederickson with effectively "no ability to register." *See* Joliet Mot. at 12; *see also Derfus*, 42 F. Supp. 3d at 892-93; *Saiger*, 37 F. Supp. 3d at 981-82.

Moreover, the Joliet Defendants' argument glosses over Frederickson's testimony that, after being forced by the Bolingbrook Defendants to relocate back to Joliet, the Joliet Defendants flatly refused to register him on each of February 28, March 1, March 2, and March 3 2011.  *See supra* at 14.  The Joliet Defendants make no mention of Frederickson's attempts to register on February 28 and March 1, but they do offer testimony from Avila that Frederickson declined the Joliet Defendants' offer to register him on March 2.  *See* Joliet SOF ¶¶ 99-101.  Again, such a genuine, material factual dispute is not amenable to resolution on summary judgment.  *See, e.g.*, *Funds in the Amount of $271,080*, 816 F.3d at 909.  But assuming the jury credits Frederickson's testimony, his claim is in line with the other cases from this district recognizing the liberty interest in the right of Offenders to register under SORA.  *See, e.g.*, *Johnson v. City of Chicago*, 2016 WL 5720388, at *2; *Beley*, 2015 WL 684519, at *2.

      2.    <u>Defendants' Excuses For Their Conduct Rely On Faulty Premises</u>

Beyond attempting to distinguish the liberty interest implicated by Frederickson's claim, Defendants offer two specious legal arguments about SORA that they argue absolve them from liability.  *First*, the Bolingbrook Defendants contend that they were "incapable of completing Plaintiff's SORA registration" because they "were unable[] to obtain ownership of Plaintiffs' LEADS file from JPD."  *See* Bolingbrook Mot. at 18.  As discussed above, while a registering agency (e.g., Bolingbrook) has an obligation under SORA to "enter the information [provided by the Offender on his registration form] into [LEADS]," the input into LEADS is distinct from registration itself.  *See* 730 ILCS 150/8; *see also supra* at 4 & n.4.  "Registration as required by [SORA] consists of a statement in writing signed by the registrant providing the information required by the Department of State Police."  *Molnar*, 222 Ill. 2d at 500 (citing 730 ILCS 150/8).  Indeed, the Bolingbrook Defendants' assertion about LEADS' role in the SORA scheme is contradicted by both the Joliet Defendants, Joliet SOF ¶ 20, and Frederickson's sex-offender-

registration expert Michael Musgrove, *see* Pl.'s Ex. C, M. Musgrove Dep. 144:21-145:7, 146:18-147:5.[17]

*Second*, the Joliet Defendants argue that "plaintiff was required to register out of Joliet before he could register elsewhere" (i.e., Bolingbrook). *See* Joliet Mot. at 12. Their argument has no basis in the law. As discussed above, while SORA does require an Offender to report a change of address to his previous jurisdiction within three days of such a change, *see* 730 ILCS 150/6, SORA does ***not*** make an Offender's registration with a new jurisdiction contingent upon the Offender having "registered out" with previous jurisdiction. *See id.*; *see also supra* at 5; *see, e.g.*, Joliet Ex. K, Pl.'s Feb. 2, 2011 SORA Registration Form at RF00000604. The Joliet Defendants' argument also ignores Frederickson's testimony that he repeatedly informed Landeros that he intended to leave Joliet but Landeros refused to process the change of address. *See supra* at 8-9. In short, Defendants have failed to identify any legal basis for limiting Frederickson's liberty interest in registering under SORA.[18] *See, e.g.*, *Johnson v. City of Chicago*, 2016 WL 5720388, at *2; *Beley*, 2015 WL 684519, at *2.

### 3. Complying With SORA's Requirement Of Providing "Accurate Information" Is Also Protected By Procedural Due Process

Frederickson has adduced sufficient evidence to support his pre-February 2011 procedural due process claim with respect to Landeros's failure to update his registration with correct employment information. SORA's "strict criminal liability" extends to all provisions.

---

[17]     At the very least, Bolingbrook could have followed its normal process when it does not have ownership of an Offender's LEADS file and placed an "add on" onto Frederickson's file. *See* Pl.'s SOAF ¶ 27.

[18]     Although they do not make clear how it supports their arguments, the Bolingbrook Defendants cite to an alleged statement to Talbot from an unnamed person affiliated with the Illinois State Police and contend that their instructing Frederickson to return to Joliet before the Bolingbrook Defendants would register was consistent with that statement. Bolingbrook Mot. at 18. Such rank hearsay (assuming *arguendo* it has some relevance) is inadmissible to defeat summary judgment. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016).

730 ILCS 150/10(a); *Johnson v. City of Chicago*, 2016 WL 5720388, at *2. The failure to

provide "accurate information" is punishable as a felony with mandatory minimum jail time and

fines. *See* 730 ILCS 150/10(a). When Landeros repeatedly refused to change Frederickson's

registration form to reflect the correct name of his employer,[19] Landeros was "jeopardiz[ing]"

Frederickson's "significant interest in freedom from liability and incarceration." *Beley*, 2015

WL 684519, at *2. So too with Frederickson's request that "contractor" be listed on his

registration. Defendants offer no legal support for their cursory, *post hoc* litigation position that

"[t]he contractor status that plaintiff wanted on his form was unnecessary to the purposes of the

registration process [*sic*]. Nor did the lack of it . . . expose him to arrest." Joliet Mot. at 13.

**B.     By Intentionally Treating Frederickson Differently Than Similarly Situated Offenders For No Rational Reason, Defendants Violated Frederickson's Equal Protection Rights (Count III)**

"[C]lass-of-one claims are designed to prevent government actors from singling out a

person for arbitrary abuse," *Brunson*, 843 F.3d at 705, including claims "based on allegations of

the irrational or malicious application of law enforcement powers." *Geinosky v. City of Chicago*,

675 F.3d 743, 747 (7th Cir. 2012). A "class-of-one plaintiff must show (1) that he has been

intentionally treated differently from others similarly situated, and (2) that there is no rational

basis for the difference in treatment." *Fares Pawn, LLC v. Ind. Dep't of Fin. Institutions*, 755

F.3d 839, 845 (7th Cir. 2014) (*citing Village of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000)). "Although the police are necessarily afforded wide discretion in performing their

duties, that discretion does not extend to discriminating against or harassing people." *Geinosky*,

675 F.3d at 747. Both sets of Defendants argue that they are entitled to summary judgment

because (1) Frederickson failed to identify comparators and (2) Defendants' conduct towards

---

[19]     There is no dispute that the correct name of the body shop at which Frederickson worked was Greg's Body Shop, not Greg's Auto Body. *See* Pl.'s SOAF ¶ 5.

Frederickson was rational. *See* Joliet Mot. at 15-18; Bolingbrook Mot. at 18-20.[20] The record contains ample evidence that the Defendants intentionally and irrationally treated Frederickson differently, and issues of material fact preclude summary judgment. *See, e.g.*, *Funds in the Amount of $271,080*, 816 F.3d at 909.

### 1. Frederickson Has Similarly Situated Comparators

Both sets of Defendants argue that Frederickson's class-of-one claim fails because Frederickson cannot identify a comparator. Bolingbrook Mot. at 20; Joliet Mot. at 16-17. To be considered "similarly situated," comparators need not be replicas, but only must be "directly comparable in all material respects." *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010).[21] "Whether a comparator is similarly situated is usually a question of fact for the jury" and is not a "precise formula." *Id.* Here, the appropriate comparator to Frederickson is a Homeless Offender who moves jurisdictions. Contrary to Defendants' assertions, there can be no credible argument that such comparators do not exist.[22] The "material respects" common to all Homeless Offenders who move jurisdictions are:

---

[20]     The Bolingbrook Defendants also appear to argue that that they did not treat Frederickson any differently than other similarly situated individuals. As an initial matter, the Bolingbrook Defendants cannot claim both that "the record is undisputed that Plaintiff was treated exactly the same as similarly situated sex offenders," Bolingbrook Mot. at 19, and that "Plaintiff was not, in February 2011, similarly situated to any other sex offender that had previously sought to register at the Bolingbrook Police Department," Bolingbrook Mot. at 20. One argument necessarily precludes the other and this contradiction is indicative of the Bolingbrook Defendants' inability to prove that no reasonable jury could find for Frederickson on this claim. *Anderson*, 477 U.S. at 248.

[21]     *See also Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 914-15  (7th Cir. 2012) (en banc) (plurality opinion) (suggesting there should be no requirement for detailing comparators).

[22]     In Joliet, Landeros was registering up to 240 Offenders per year, including 10-15 Homeless Offenders at any given time. Joliet SOF ¶11; Joliet Ex. A, T. Landeros Dep. 109:18-20. Joliet has the highest number of Offenders located within its borders of all the municipalities in Will County. Joliet SOF ¶ 9. For Bolingbrook, while it is unclear precisely how many Offenders were registering during the relevant time period, Wlodarksi testified that she previously encountered situations where an Offender registered in Bolingbrook while his or her LEADS file was still owned by a different jurisdiction approximately twenty times. *See supra* at 10. Witnesses from both the Joliet Police Department and the

- Weekly registration requirements;
- Reporting the last locations where the Homeless Offender slept for the previous seven days;
- Possibility of arrest and detainment for inaccurate or out-of-date registration information; and
- Requirement to bring the previous registration form when the Homeless Offender moves to a new jurisdiction.

Frederickson was subject to the same requirements in these "respects" as any other Homeless Offender, yet he was treated differently than every single other Homeless Offender in the same situation. *See, e.g.*, *Brunson*, 843 F.3d at 707 (reversing the district court's finding that plaintiff lacked comparators and finding that business that needed to renew liquor licenses were sufficiently similar); *see also, e.g.*, *Muczynski v. Lieblick*, No. 10-CV-0081, 2012 WL 5470738, at *3 (N.D. Ill. Nov. 8, 2012) (demonstrating the imprecise formula of determining comparisons by finding "that other individuals that may be investigated for a crime" were sufficiently similarly situated).

Moreover, identifying comparators is not necessary "where the alleged facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose." *Geinosky*, 675 F.3d at 748 (reversing district's court's dismissal of class-of-one claim despite the plaintiff's failure to specifically identify other Chicagoans who had not received more than a dozen bogus parking tickets from the same police unit during a similar time frame because the nature of the officers' illegitimate conduct clearly evidenced their improper discriminatory purpose); *see also Brunson*, 843 F.3d at 707 ("if the allegations signal that the plaintiff alone suffered the defendant's harassment, there is no need to identify a comparator."). As detailed below, a reasonable jury could find that Defendants' irrational and harassing conduct towards Frederickson obviates his need to identify comparators in the first place.

---

Bolingbrook Police Department described the process by which Offenders coming from a previous jurisdiction would be registered. Bolingbrook SOF ¶¶ 15-19; Joliet SOF ¶¶ 18-20, 25.

2.    <u>Defendants Treated Frederickson Differently</u>

The Joliet Defendants do not contest that they treated Frederickson differently[23] and thus that argument is waived. *Basta v. Am. Hotel Register Co.*, 872 F. Supp. 2d 694, 704 (N.D. Ill. 2012) ("[F]ailure to properly advance an argument with citation to legal authority constitutes waiver."); *McCready v. Title Servs. of Ill., Inc.*, No. CIV.A.06 C 6280, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008) ("When a party fails to address an argument in his summary judgment brief, it is deemed a waiver.").

The Bolingbrook Defendants do contest the point, arguing that they treated Frederickson in "exactly the same way" as they treat all other Offenders who attempt to register in Bolingbrook while their LEADS file was still owned by another jurisdiction because they never "complete the SORA registrations until [an Offender's] LEADS files are released." Bolingbrook Mot. 19. The Bolingbrook Defendants' argument finds no support in either the facts or the law. As described above, *see supra* at 4, 19, the Bolingbrook Defendants are legally wrong when they argue that they could not register Frederickson because the Joliet Defendants refused to transfer his LEADS file. More to the point, the testimony that the Bolingbrook Defendants rely on to

---

[23]    Nor could they as the record is replete with examples of the Joliet Defendants singling out Frederickson. For example,

- Landeros admitted that he refused to update Frederickson's registration forms where no other witness, including the Joliet detective in charge of registration before Landeros, could offer *any reason why* one should not update a registration form, *supra* at 7-8;

- No witness could recall *a single instance* where a police department refused to transfer an Offender's LEADS file, *supra* at 10 & n.10;

- No witness could identify *any other Offender* whose registration attempt had been denied, *supra* at 12-13 & n.13; and

- Scarpetta's fulsome investigation of John Smith's grievance about Landeros, complete with a recorded interview with Landeros and a formal disposition letter, demonstrate how grievances should be treated. In responding to Frederickson's complaint, *Scarpetta admitted* that even though his job in handling citizen grievances was to determine whether conduct complained of constituted either a violation of the law or of Joliet Police Department policy, *he never learned whether the conduct Frederickson alleged constituted a violation of Joliet Police Department policy or procedure*, *supra* at 14-15.

support the notion that the Bolingbrook Police Department does not register Offenders whose

LEADS file is owned by a different jurisdiction does no such thing.   The Bolingbrook Police

Department's corporate representative testified that when Offenders come to the Bolingbrook

Police Department for the first time and the previous jurisdiction has not yet released the

Offender's LEADS file, "we would start our own hard copy file, our own paper file; and then we

would add an add-on there that–something to the effect at this date and time the person registered

with the Village of Bolingbrook and are now residing within." *See* Bolingbrook Ex. F, K.

Teppel. Dep. 94:4-15.[24]   These are actions that the Bolingbrook Defendants indisputably did not

take with respect to Frederickson on February 16 or 23, 2011.[25]   In short, the Bolingbrook

Defendants have fallen short of their burden to show that a reasonable jury could never find that

they treated Frederickson differently than similarly situated individuals.

> 3.     Defendants' Disparate Treatment of Frederickson Was Irrational

Both sets of Defendants argue that their treatment of Frederickson was rational.

Bolingbrook Mot. 20-22; Joliet Mot. 18.  The standard for determining the "rational basis"

element of class-of-one claims remains in flux, but Frederickson's class-of-claim survives even

---

[24]     The other testimony the Bolingbrook Defendants cited on this score also does not serve their argument.  Kloepfer testified that "many times" the Bolingbrook Police Department will require Offenders who report for the first time *without their previous registration paperwork* to return to the previous jurisdiction to get that paperwork.  Pl.'s SOAF ¶ 27, Bolingbrook Ex. B, D. Kloepfer Dep. 27:16-2818 ("many times, people are sent back – and this is over 20 years.  People have been sent back to get that paperwork.")  Importantly, Frederickson brought his previous registration forms with him to Bolingbrook on February 9, 2011.  *See supra* at 9.  While Wlodarksi testified that Offenders "are supposed to go back to their old jurisdiction, inform them, I am moving, and get put into moving status," she, *in her very next answer*, immediately disclaimed knowing whether this is a requirement or consistently observed.  Pl.'s SOAF ¶ 27; Bolingbrook Ex. I, N. Wlodarski Dep. 95:14-23.

[25]     Additionally, the Bolingbrook Defendants do not address their part in removing Frederickson from the Bolingbrook Village Hall on February 23, 2011 and thereby preventing him from filing a grievance against them.  *See supra* at 13-14.  Failing to address this conduct on its own creates a genuine issue of material fact precluding summary judgment.  *See Basta*, 872 F. Supp. 2d at 704.

the most stringent standard.[26]  Under that standard, a class-of-one claim cannot be defeated at

summary judgment if a reasonable jury could find that the disparate treatment was irrational and

motivated by personal ill will or other legitimate purpose.  *Del Marcelle v. Brown Cty. Corp.*,

680 F.3d 887, 889 (7th Cir. 2012) (en banc) (Posner, J., lead opinion).  But oftentimes

irrationality can be inferred from the treatment of the plaintiff.  *See, e.g.*, *CBS Outdoor, Inc. v.

Village of Plainfield*, 38 F. Supp. 3d 896, 907 (N.D. Ill. 2014) ("While [plaintiff] may not be

required to allege an improper motive, it must allege facts that would allow the Court to infer

that there is no rational basis for the disparate treatment.").  Frederickson has presented more

than sufficient evidence for a reasonable jury to find that Defendants acted irrationally and that

their treatment of Frederickson was motivated by personal reasons unrelated to their duties as

police officers.

The Joliet and Bolingbrook Police Departments have been registering Offenders since

SORA's inception in 1996.  Frederickson deposed three individuals from the Joliet Police

Department and nine individuals from the Bolingbrook Police Department who held various

roles in registering Offenders over the last twenty years.  Not a single one of them could think of

one instance where (1) an Offender's registration or updated registration information was refused

or (2) a police department refused to transfer a LEADS file.[27]  And there is no rational reason to

justify either of these actions.  As Frederickson's expert Mike Musgrove explained, "[b]ecause it

is so important to law enforcement efforts that offenders register as required, and because there

---

[26]     "The crux of the disagreement was whether the plaintiff in a class-of-one claim must demonstrate
only that there is no possible justification or rational basis for the defendant's actions, *Del Marcelle*, 680
F.3d at 900 (Easterbrook, C.J., concurring), or if the plaintiff must demonstrate a lack of justification *and*
also present evidence of hostile intent or animus, *id*. at 889, or if the plaintiff must demonstrate an
absence of rational basis, which can be satisfied with evidence of animus, *id*. at 913 (Wood, J.,
dissenting)."  *Brunson*, 843 F.3d at 706  (emphasis in original).

[27]     Musgrove testified that "[i]n the thousands of registrations [he has] done, [he has] never heard of
somebody not move [*sic*] the file."  Pl.'s Ex. C, M. Musgrove Dep. 180:7-9.

are severe consequences for providing false information, police officers should register

individuals before verifying any information provided." Pl.'s Ex. P, Musgrove Report ¶ 24.

The Bolingbrook Defendants claim their refusal to register Frederickson was rational

because the Joliet Police Department failed to transfer Frederickson's LEADS file. Bolingbrook

Mot. 21-22. While the argument underscores the Joliet Defendants' culpability, it does not

vitiate the Bolingbrook Defendants' liability. Entering information into LEADS is not a

prerequisite for registration or an excuse to refuse a registration. It is an administrative task that

must be done after a police department registers an Offender. *See supra* at 4 & n.4.[28] Contrary

to the universally accepted purpose of SORA to enable law enforcement to locate Offenders as

needed and to ensure that Offenders comply with their particular registration requirements,

Bolingbrook SOF ¶ 7; Joliet SOF ¶ 16, refusing to register an deprives police departments of the

most recent and accurate information as to the actual location of Offenders.[29]

For their part, the Joliet Defendants attempt to justify their conduct by arguing that

allowing an Offender to "register in Bolingbrook one week, Downers Grove, the next, and Peoria

the following week" without "registering out" would defeat the purpose of SORA. Joliet Mot.

---

[28]  Putting aside that the Bolingbrook Defendants are wrong about the law, they also misstate the
testimony of their own witnesses. Both Talbot and Brick admitted to refusing to register Frederickson,
Bolingbrook SOF ¶¶ 52-54, 56-57, but neither cited the Joliet Police Department's refusal to transfer
Frederickson's LEADS file as the reason. Talbot stated that he refused to register Frederickson because
Frederickson did not (and could not) describe where he *would* sleep. *See supra* at 13; Bolingbrook Ex. C,
S. Talbot Dep. 89:8-11 ("Q: So if [Frederickson] would have provided just one location and one night,
would you have registered him? A: Yes."); Brick explained that he refused to register Frederickson
because, among other things, the Joliet Police Department had an ongoing investigation into
Frederickson's residency and had instructed the Bolingbrook Police Department not to register Rex.
Bolingbrook Ex. K, J. Brick Dep. 62:20-66:13 (discussing the reasons Brick refused to register
Frederickson and making no mention of Joliet's refusal to transfer Frederickson's LEADS file).

[29]  Additionally, because the Bolingbrook Defendants fail to even address their removal of
Frederickson from the Bolingbrook Village Hall, s*ee supr*a at 13-14, they offer no rational justification
for their conduct. The exact nature of the Bolingbrook Defendants participation in preventing
Frederickson from filing a grievance against them and whether there could possibly be some rational
justification for that conduct are questions of fact for the jury to determine, thus precluding summary
judgment. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp.*, 477 U.S. at 322-23.

18. [30] This argument fails for several reasons. *First*, to make this argument work, the Joliet Defendants must ignore Frederickson's testimony that he notified the Joliet Police Department on February 2, 2011 that he was moving to Bolingbrook, *see supra* at 8-9, a factual dispute precluding summary judgment. *See, e.g.*, *Funds in the Amount of $271,080*, 816 F.3d at 909. *Second*, SORA is agnostic about an Offender moving from town to town so long as the Offender complies with the requirements of SORA and reports to the appropriate jurisdiction within the appropriate time frame. What does defeat the purpose—and is irrational—is a refusal to take the information that the Offender provides or to instruct another jurisdiction not to accept the Offender's SORA information. Such conduct deprives law enforcement of the information necessary to locate Offenders should the need arise. As Musgrove made clear, if a police officer doubts the veracity of the information provided by the Offender, the proper course is to register the Offender, and then investigate that information after registration. *See* Pl.'s Ex. P, Musgrove Report ¶ 22 ("If there are any doubts as to the veracity of information provided, police officers should investigate and verify the information *after registration*") (emphasis added).[31]

Finally, the Joliet Defendants decline to address all of the other irrational ways in which they treated Frederickson including: (1) refusing to update Frederickson's registration form, *see supra* at 6-7; (2) instructing the Bolingbrook Police Department not to accept Frederickson's

---

[30]     In the course of making this argument, however, the Joliet Defendants refuse to acknowledge that they would not transfer ownership over Frederickson's LEADS file to Bolingbrook. Whether the Joliet Police Department transferred Frederickson's LEADS file to the Bolingbrook Police Department is, perhaps, the most relied-upon fact in the Bolingbrook Defendants' Motion. While the evidence supports a finding that the Joliet Police Department failed to transfer his LEADS file appropriately, the Joliet Defendants failure to admit as much creates a material factual dispute defeating summary judgment. *See, e.g.*, *Funds in the Amount of $271,080*, 816 F.3d at 909.

[31]     *See also* Pl.'s Ex. C, M. Musgrove Dep. 105:5-8 (when asked whether "Bolingbrook should have taken his registration on February 16th and on the 23rd and then arrested him if they believed or if there was evidence that he didn't live there, that he lived in Bolingbrook?" Musgrove answered: "I think they should have registered him. And if they could confirm a violation, then they do what they think is appropriate, arrest him, send it to the District Attorney's Office, give him a warning.").

registration, *see supra* at 11; (3) refusing to register Frederickson on February 28, March 1, March 2, and March 3, 2011, *see supra* at 14; and (4) failing to undertake anything more than a pretextual investigation into the conduct underlying Frederickson's multiple grievances, *see supra* at 14-15.  Each one of these actions demonstrates the Joliet Defendants' irrational treatment of Plaintiff and, at the very least, create a genuine issue of material fact that precludes summary judgment.  *See, e.g.*, *Funds in the Amount of $271,080*, 816 F.3d at 909.

### 4.   Defendants Exhibited Animus Towards Frederickson

It is not clear in this circuit whether Frederickson must put forward evidence showing that Defendants' disparate treatment of him was motivated by improper personal reasons.  *See supra* at 25-26; *see also Del Marcelle*, 680 F.3d at 899.  Defendants do not address whether they had any improper personal reasons for their treatment of Frederickson and thus have forfeited their right to contest this element (should this Court deem it necessary).  *McCready*, 2008 WL 2435933, at *3 ("When a party fails to address an argument in his summary judgment brief, it is deemed a waiver.").  In any event, Defendants' animus towards Frederickson is easily inferred from their unique treatment of Frederickson: no Defendant could recall a single other instance where an Offender's registration was refused, a LEADS file transfer was blocked, or an instruction was given not to accept a registration.  Their animus is further supported by Frederickson's and David Brown's affidavits and testimony.  *See, e.g.*, Pl.'s Ex. A, D. Brown Dep. 61:1-62:5 ("[Landeros] wasn't just harassing [Frederickson] anymore.  He was actually looking to put him away."); Pl.'s Ex. K, R. Frederickson Aff.; Pl.'s Ex. M, D. Brown Aff.

## C.  Defendants' Refusal To Allow Frederickson To Register In Bolingbrook Violated His Right To Travel (Count I)

The Defendants' arguments that Frederickson was not unlawfully prevented from traveling from Joliet to Bolingbrook are specious and contradictory.[32]  Several circuits have found that the right to travel intrastate—or the right to free movement—"enjoys a unique and protected place in our national heritage."[33]  *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (noting that the right to intrastate travel is "an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function"); *see also, e.g.*, *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990).  This is because the Due Process Clause "protects those rights that are 'the very essence of a scheme of ordered liberty' and essential to 'a fair and enlightened system of justice.'"  *McDonald v. City of Chicago*, 561 U.S. 742, 760 (2010) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)).  Moreover, the Seventh Circuit, while reserving decision on whether the right to intrastate travel is protected by the Constitution, has recognized that an individual's rights are implicated particularly where the individual is prevented from participating in "gainful employment."  *Doe v. City of Lafayette,* 377 F.3d 757, 771 (7th Cir. 2004) (finding that a statute banning a sex offender from state parks did not violate plaintiff's due process rights because in part, "[h]e is not limited in moving from place to place within his locality to socialize with friends and family, to participate in gainful employment or to go to the market to buy food and clothing").

Here, Defendants do not contest that they refused to register Frederickson in Bolingbrook.  *See supra* at 12-13; *see also, e.g.,* Bolingbrook Mot. at 2; 4; Joliet Mot. at 7-9.

---

[32]  Indeed, the Bolingbrook Defendant's argument on this point does not substantively discuss the right to travel whatsoever, such that the argument could be fairly considered waived.  *McCready*, 2008 WL 2435933, at *3.

[33]  The Supreme Court and the Seventh Circuit have reserved the question regarding whether the Constitution protects the right to intrastate travel.  *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250, 255-56 (1974); *Schor v. City of Chicago*, 576 F.3d 775, 780 (7th Cir. 2009).

Defendants likewise do not contest that SORA required Frederickson to register weekly where he was located, or else he was subject to arrest. 730 ILCS 150/3; Bolingbrook Mot. at 5-6; Joliet Mot. at 6. Frederickson wanted to move to Bolingbrook in order to obtain gainful employment and escape harassment, *see supra* at 8-9, and knew that he could not stay in Bolingbrook if he was not registered there, *see supra* at 9-10. Defendants prevented Frederickson from moving to and working in Bolingbrook, violating his right to "carry out [his] daily life activities." *Johnson v. City of Cincinnati*, 310 F.3d at 498.

The Joliet Defendants argue that the "only real limitation on plaintiff's right to travel" was not based upon the actions of Defendants but rather the "registration and reporting requirements under SORA." Joliet Mot. at 5. Frederickson was well aware and respectful of his reporting requirements under SORA. Indeed, that is precisely why Frederickson attempted to register in Bolingbrook on February 16 and February 23, 2011. *See supra* at 12-13. But because the Defendants conspired to prevent Frederickson from registering in Bolingbrook, he had no choice but to stop working at J&J Autobody and return to Joliet. *See supra* at 14. Contrary to the Joliet Defendant's assertions, SORA only limits Frederickson's right to travel in Illinois in that he is required to register where he is located; Frederickson tried to do just that.

The Joliet Defendants also confusingly argue that "Landeros did nothing more than perform his . . . mandate under SORA to assure Joliet keeps track of a sex offender's whereabouts." Joliet Mot. at 7. However, Landeros's actions thwarted SORA's mandate. Defendants' irrational targeting of Frederickson made it so that Frederickson ***could not*** register where he was located, and law enforcement would be ***unable*** to keep track of his whereabouts. Defendants' actions forced Frederickson cease working and staying in Bolingbrook and go back to Joliet, lest he be subject to arrest for failure to register.

31

Because of the stakes involved—placing Frederickson at immediate risk of being arrested should he continue staying and working in Bolingbrook—Defendants' conduct "shocks the conscience." *Duran v. Sirgedas*, 240 F. App'x 104, 123 (7th Cir. 2007) (affirming a denial of summary judgment on the basis of qualified immunity). Defendants prevented Frederickson from complying with his statutorily mandated requirements; their actions were arbitrary and without justification. *Id.* at 121-22 ("[C]onduct intended to injure in some unjustifiable by any government interest shocks the conscience."). Indeed, the government interest weighs in favor of ensuring that Homeless Offenders register wherever they are currently located. *Molnar*, 222 Ill. 2d at 499 ("[SORA] was designed to aid law enforcement by allowing them to 'monitor the movements of the perpetrators by allowing ready access to crucial information."); *Wlecke*, 2014 IL App. (1st) 112467, ¶ 5 ("The obvious purpose of the Act is to assist law enforcement agencies in tracking the whereabouts of sex offenders and to provide the public information about where they are residing."). Therefore, Defendants' arbitrary and baseless conduct was conscience shocking and violated Frederickson's Fourteenth Amendment due process rights. *Johnson v. City of Cincinnati*, 310 F.3d at 498; *cf. Doe*, 377 F.3d at 771. At the very least, there are material factual issues regarding whether Defendants' actions prevented Frederickson from staying and working in Bolingbrook such that summary judgment should be denied on this claim.

### D. Defendants Conspired To Deprive Frederickson Of His Constitutional Rights (Counts IV And V)

Defendants' arguments regarding Frederickson's conspiracy claims fail on the facts and the law. *First*, as explained above, there is ample evidence that Defendants violated Frederickson's constitutional rights. Thus Defendants' contentions that Frederickson's conspiracy claims should be dismissed for failing to establish these violations, which underlie his state and federal conspiracy claims, should be denied. The Joliet Defendants make no other

argument in support of summary judgment on the conspiracy claim and their motion should be denied as to Counts IV and V.

*Second*, the Bolingbrook Defendants' argument that there are "no facts" to support the conspiracy claims misstates the factual record in this case. The record contains ample evidence of a conspiracy between Defendants to deprive Frederickson of his constitutional rights, creating factual disputes that must be decided by the jury. *See, e.g.*, *Funds in the Amount of $271,080*, 816 F.3d at 909.

Conspiracy claims under state and federal law need not be supported by direct evidence. *See Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979) ("[C]ircumstantial evidence may provide adequate proof of conspiracy."), *cert. granted in part, rev'd on other grounds*, 446 U.S. 754 (1980). Nor does the conspiratorial agreement need to be explicit. *See Patrick v. City of Chicago*, No. 14-CV-3658, 2016 WL 5792309, at *19 (N.D. Ill. Oct. 4, 2016) ("An express agreement among the conspirators is not necessary"). Thus, as the Seventh Circuit noted in *Hampton*, "the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) . . . reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621.

As a result, the bar to defeat summary judgment on civil conspiracy claims is low. For example, in *Krilich v. Village of South Holland*, the court found there were sufficient facts in support of a conspiracy to falsely arrest the plaintiff to deny summary judgment where the evidence was a conversation between the two alleged conspirators prior to plaintiff's arrest during which one pointed at the plaintiff. No. 92 C 5285, 1994 WL 457227, at *2 (N.D. Ill. Aug. 19, 1994). Similarly here, it is undisputed that Defendants Landeros and Talbot had a

33

phone conversation  regarding Frederickson immediately before the Bolingbrook Defendants refused to register him.  Indeed, Defendants' conspiratorial agreement from that phone call was *documented*—Defendant Gunty's subsequent email to the Bolingbrook Police Department stated, "Per JPD don't register [Frederickson] here please."  Pl.'s Ex. J, Email from C. Gunty to all-police (Feb. 11, 2011).  This email is direct evidence of a conspiratorial agreement between the Bolingbrook and Joliet Defendants to prevent Frederickson from registering.

Further, Defendants acted in a way that was consistent with this conspiratorial objective. Defendant Landeros had previously threatened to arrest Frederickson if he ever attempted to leave Joliet.  *See supra* at 7.  The Bolingbrook Defendants refused to register Frederickson on February 16 and 23, 2011.  *See supra* at 12-13.  Their refusals not only demonstrate their agreement with the conspiratorial objective, but are also overt acts in furtherance of the conspiracy.[34]

Lastly, the Bolingbrook Defendants are not immune from Frederickson's state-law conspiracy claim under the Illinois Tort Immunity Act.  As this Court recognized in its ruling on the Bolingbrook Defendants' Motion to Dismiss, "for immunity to apply, the [] Defendants' actions must have been 'both a determination of policy and an exercise of discretion.'"  Order on Bolingbrook Motion to Dismiss, Dkt. 137 at 2 (citation omitted).  Record evidence shows that Defendants' actions were neither a policy determination or exercise of discretion.  Therefore this is question of fact for the jury and summary judgment should be denied.

---

[34]     The Bolingbrook Defendants cite to *Indianapolis Minority Contractors Association v. Wiley*, 187 F.3d 743 (7th Cir. 1999), in support of their argument that there is no evidence of a conspiracy, but seem to have mistakenly attributed this citation to a quote from a different case.  Regardless, *Indianapolis* is not applicable because, unlike here, there was no evidence of any interaction between the alleged co-conspirators about the subject of the conspiracy.

A policy decision requires "a governmental entity to balance competing interests and to make a judgment call as to what solution will best serve those interests." *Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 379 (2003). As an initial matter, the Bolingbrook Defendants fail to identify any competing interests that they balanced in determining how to handle Frederickson's registration attempts. Nor does the factual record does show Defendants' consideration of competing interests. Rather, Landeros instructed the Bolingbrook Defendants not to register Frederickson even though he had no reason to believe that Frederickson was not homeless in Bolingbrook during this time. *See supra* at 11 & n.11. The Bolingbrook Defendants then unquestioningly followed Landeros's instructions. *See supra* at 11-13.

The Bolingbrook Defendants instead contend that they are entitled to immunity because they were unable to register Frederickson without ownership over his LEADS file and because Frederickson allegedly failed to "register out" of Joliet. As discussed in Section I.A.2 above, these arguments find no support in SORA, which provides that an Offender's registration is complete after the Offender provides a written statement with the required information and does not require an Offender to register out before registering in with a new law enforcement agency. *See* 730 ILCS 150/6; 730 ILCS 150/8.

The Bolingbrook Defendants' actions were also ministerial, not discretionary, and therefore they are not immune for this independent reason. Illinois courts hold that if a public official is bound to act in a given manner by statutory mandate, his failure to so act is not immunized under the Act, even if that official's conduct in general is subject to broad discretion. *See, e.g.*, *Hill v. Galesburg Cmty. Unit Sch. Dist. 205*, 346 Ill. App. 3d 515 (2004). In *Hill*, the court held that a teacher was not immune because "the teacher's responsibility under the Eye Protection Act was triggered and his acts were ministerial in nature." *Id.* at 520. The acts were

35

ministerial because "[t]he statute require[d] teachers to ensure all students are wearing eye protection" and did not permit the teacher to make an independent decision. *Id.* Similarly here, the Defendants' responsibilities under SORA were triggered and SORA imposes specific requirements on police officers regarding the registration of Homeless Offenders. It states, "The agency of jurisdiction *will* document each weekly registration . . . ." 730 ILCS 150/3(a) (emphasis added). Nowhere does SORA suggest that officers have discretion to refuse such registrations. The Bolingbrook Defendants bear the burden of proof for this affirmative defense and have failed to show it applies. At most, Defendants have raised a question of fact for the jury.

## II. QUALIFIED IMMUNITY DOES NOT PROTECT DEFENDANTS' UNLAWFUL CONDUCT

Defendants argue that they are protected by qualified immunity, even if their actions were unconstitutional. Joliet Mot. at 18-20; Bolingbrook Mot. at 10-14. Qualified immunity does not, however, protect those who are either "plainly incompetent" or who "knowingly violate the law." *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010). In order to show that Defendants knowingly violated the law, the right must either be clearly established by pre-existing law or so "patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (finding that defendants were not protected by qualified immunity).

Moreover, it is not required to find a precedent dealing with the exact factual situation at issue. *Id.* The "salient question" is therefore "not whether there is a prior case identical to [Frederickson's] claim, but whether the state of the law at the relevant time gave the Defendants fair warning that their treatment of [Frederickson] was unconstitutional." *Id.* at 781 Reasonable officials should have known that preventing a Homeless Offender from registering in a new

jurisdiction for arbitrary and malicious reasons would be unconstitutional, and therefore qualified immunity does not apply.

### A. Reasonable Officials Should Have Known That Preventing Frederickson From Registering Violated His Constitutional Rights

The ability for a Homeless Offender to register, because of the severe legal consequences of failing to do so, implicates constitutionally protected liberty rights. *Derfus*, 42 F. Supp. 3d at 899-900; *Saiger*, 37 F. Supp. 3d at 984. Although precedent has not established that the right of a Homeless Offender to register under SORA was "clearly established" as of February 2011, here, Defendants' conduct was so "patently violative" of Frederickson's rights, "that reasonable officials would know without guidance from a court." *Escobedo*, 600 F.3d at 780. Here, as detailed above, Defendants' conduct, motivated by ill will, in placing Frederickson in legal jeopardy by refusing to allow him to register without any rational purpose in so doing, "shocks the conscience" and any reasonable official would know that the conduct violated the Constitution.

### B. Frederickson's Right To Be Treated In A Non-Arbitrary Manner Was Clearly Established In February 2011

The Equal Protection Clause provides a remedy when "a powerful public official picked on a person out of sheer vindictiveness." *Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995). The Seventh Circuit has made it clear since at least 1998 that where government officials "refuse[] to perform [an] obligation for one of the residents, for no other reason than a baseless hatred, then it denies that resident the equal protection of the laws." *Olech v. Vill. of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998).

In *Olech*, plaintiffs alleged that village officials deprived them of water for three months because the plaintiffs sued the village, and the resulting "ill will" motivated the village to treat plaintiffs differently from the other village's residents. *Id*. at 387. The pattern here is

fundamentally similar. The Bolingbrook Defendants had an obligation to register Frederickson in Bolingbrook as he requested. The Joliet Defendants likewise had an obligation to transfer Frederickson's LEADS file. It is undisputed that the Defendants did not perform these obligations.

As described in detail above, Frederickson was treated by the Defendants in an arbitrary way without any rational justification or governmental interest. *See supra* at I.B.3. To the contrary, the governmental interest weighed in favor of allowing Frederickson to register in Bolingbrook. *See supra* at 27. And of course, SORA requires that Defendants allowed Frederickson to register—their refusal to do so was in contravention to their statutory duties. *See supra* at 34-35; *see also* 730 ILCS 150/3(a) ("The agency of jurisdiction *will* document each weekly registration . . . .") (emphasis added). Defendants have all admitted that Frederickson was the only Homeless Offender who was not permitted to register or whose LEADS file was not permitted to be transferred. SOF ¶¶ 24-25; 38-39. It is unknown why Defendants, particularly Landeros, harbored ill will against Frederickson, but Frederickson's vindictive and arbitrary treatment, which the facts suggest were motivated by "illegitimate animus." *Olech*, 160 F.3d at 387. Even though Frederickson does not know "for certain why he was targeted," where, as here, the facts show a pattern of conduct that is "not a legitimate exercise of discretion" and there is no "rational and proper purpose" for the conduct, it is a violation of equal protection. *Geinosky*, 675 F.3d at 748-49.

Defendants argue that the SORA statute is "complicated" or does not "offer guidance" regarding this factual statement. Joliet Mot. at 20; Bolingbrook Mot. at 14. However, any ambiguities in SORA do not excuse or justify Defendants singling out of Frederickson. Regardless of how "complicated" SORA may be, it has been clearly established constitutional

law that when law enforcement treats an individual differently than others due to personal animus, it is a violation of equal protection. *See Olech*, 160 F.3d at 387-88. Defendants are not protected by qualified immunity on this claim.

### C. Frederickson's Right To Travel To And Work In Bolingbrook Was Clearly Established In February 2011

"The constitutional right to travel has been understood as one of the rights implicit in the Due Process Clauses of the Fifth and Fourteenth Amendments." *Schor v. City Of Chicago*, 576 F.3d 775, 780 (7th Cir. 2009). While the Seventh Circuit has reserved the question as to whether there is a constitutional right to intrastate travel, "[i]n the absence of controlling precedent," courts survey relevant case law to see whether there is "such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Escobedo*, 600 F.3d at 781 (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000)). Other courts of appeals have found that the right to travel intrastate is a fundamental constitutional right. *Id.*; *Johnson v. City of Cincinnati*, 310 F.3d at 498 (Sixth Circuit holding that the Constitution protects a right to intrastate travel); *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (Second Circuit recognizing a right to intrastate travel). Although the Seventh Circuit has reserved the question, the authorities suggest that the recognition of the right to intrastate travel is merely a question of time. Andrew C. Porter, *Toward a Constitutional Analysis of the Right to Intrastate Travel*, 86 Nw. U. L. Rev. 820 (1992) (arguing that "a fundamental right to intrastate travel must exist as a logical and inevitable extension of the interstate travel doctrine"); Kathryn E. Wilhelm, *Freedom of Movement at a Standstill? Toward the Establishment of a Fundamental Right to Intrastate Travel*, 90 B.U. L. Rev. 2461 (2010) (arguing that the Supreme Court "will eventually confirm the fundamentality of the right to intrastate travel"); *see also Doe*, 377 F.3d at 771 (suggesting

that the Seventh Circuit could find that intrastate travel is a fundamental right where an individual is prevented from "socializ[ing] with friends and family, [participating] in gainful employment or [going] to the market to buy food and clothing").

Indeed, the "right to free movement . . . seems so obvious that few would expect it to ever be challenged." Wilhelm, *Freedom of Movement*, 90 B.U. L. Rev. at 2462. Moreover, the Seventh Circuit has also suggested that any right to intrastate travel may be particularly applicable where the travel is necessary to "participate in gainful employment." *Doe*, 377 F.3d at 771. The right to pursue the occupation of one's choice has also been long held as a protected constitutional right. *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005). Frederickson could not live and work in Bolingbrook if he was not registered there. *See supra* at 2-5. The Defendants were aware of this fact in 2011 and do not dispute this fundamental crux of Frederickson's claims. The Defendants were also well-aware of the severe consequences if Frederickson did not register properly and accurately. Pl.'s SOAF ¶¶ 6, 39 (Landeros and Brick testifying that they were aware that being out of compliance with SORA subjected an individual to arrest and prosecution). Defendants knew that their actions prevented Frederickson from living and working in Bolingbrook, and had "fair warning" based upon the precedent at the time that their actions were unconstitutional.

## **CONCLUSION**

For the foregoing reasons, Plaintiff requests that this Court deny (i) Defendants Detective Brick, Talbot And The Village Of Bolingbrook's Amended Motion For Summary Judgment On All Counts Of The Third Amended Complaint and (ii) Joliet Defendants' Motion For Summary Judgment.

Respectfully submitted,


/s/ Mary Rose Alexander
Mary Rose Alexander
Michael J. Faris
Johanna M. Spellman
Derek J. Linkous
Megan C. Fitzpatrick
Kate R. Elsner
Thomas H. Severson
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO (I) DEFENDANTS DETECTIVE BRICK, TALBOT AND THE VILLAGE OF BOLINGBROOK'S AMENDED MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF THE THIRD AMENDED COMPLAINT AND (II) JOLIET DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system on this 8th day of February 2017, which constitutes service on all counsel of record, registered filing users, pursuant to Fed. R. Civ. P. 5(b)(2)(D) and L.R. 5.9.


/s/ Mary Rose Alexander
One of the Attorneys for Plaintiff

42