# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

REX ALLEN FREDERICKSON,

        Plaintiff,

        v.

DETECTIVE TIZOC LANDEROS AND
DETECTIVE JAMES SCARPETTA,

        Defendants.

No. 11 C 3484

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Rex Frederickson alleges that he was prevented from registering as a sex offender by Detectives Tizoc Landeros and James Scarpetta of the Joliet Police Department in violation of rights provided by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Defendants have moved for summary judgment. R. 207. For the following reasons, that motion is granted in part and denied in part.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013).

To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

Frederickson is a convicted sex offender. R. 217 ¶ 38. Sex offenders in Illinois are required to register pursuant to the Sex Offender Registration Act ("SORA"), 730 ILCS 150.[1] Frederickson was also homeless during the time period relevant to this motion. R. 217 ¶ 4.

## I.    SORA

SORA requires sex offenders to personally register with the relevant law enforcement agency for the jurisdiction in which they reside. 730 ILCS 150/3. Registration requires the offender to provide certain information, including residential and work addresses. *Id.* Offenders with a fixed address are required to register only once a year, while homeless offenders must register weekly and report each place they have stayed during the prior seven days. 730 ILCS 150/6. Any offender who violates "any" provision of SORA is guilty of a felony, and will be

[1] SORA applies to two classes of convicted felons: the general class "sex offenders" and the subset "sexual predators." Frederickson's precise classification under the statute is "sexual predator." Frederickson's particular classification is irrelevant to this motion, so the Court will use the more generic terms "sex offender" or "offender."

"required to serve a minimum period of 7 days confinement in the local county jail."
730 ILCS 150/10.

Law enforcement agencies record SORA registration information in the Law Enforcement Agency Data System ("LEADS"), which is a statewide information database. R. 208 at 6 n.3. The jurisdiction where a sex offender is registered is said to have "ownership" of the offender's LEADS file. R. 217 ¶ 19. Only the jurisdiction that has "ownership" of a LEADS file can update the LEADS file. *See* R. 209-1 at 21 (77:20-22); R. 196 at 23 (82:20–83:2), at 23-24 (85:10–86:2).

SORA contemplates that offenders can have both "residences" and "temporary domiciles," and that offenders must register in both jurisdictions.[2] "[T]he place of residence or temporary domicile is defined as *any and all* places where the sex offender resides for an *aggregate* period of time of 3 or more days during any calendar year." 730 ILCS 150/3 (emphasis added). Any offender who plans to be away from his registered residence for more than three days must report that absence to the law enforcement agency where he resides within three days.[3] The offender must also report to register with the relevant law enforcement agency in the location he is visiting within three days. *See* footnote 2 above. Since the statute requires registration in more than one jurisdiction when an offender has a

---

[2] "The sex offender . . . shall register . . . with the chief of police in the municipality [or sheriff in the county] in which he or she resides or is temporarily domiciled for a period of time of 3 or more days." 730 ILCS 150/3.

[3] "A sex offender or sexual predator who is temporarily absent from his or her current address of registration for 3 or more days shall notify the law enforcement agency having jurisdiction of his or her current registration, including the itinerary for travel, in the manner provided in Section 6 of this Act for notification to the law enforcement agency having jurisdiction of change of address." 730 ILCS 150/3.

"temporary domicile" in addition to a "residence," but a LEADS file is only ever "owned" by one jurisdiction, it is unclear how a "temporary domicile" should be recorded in LEADS.

An offender who plans to permanently move his residence must report this to both his old and new jurisdictions of residence within three days of the move.[4] However, Bolingbrook's records clerk and Bolingbrook Detective Talbot testified that the requirement to report a move to an offender's old jurisdiction is often not enforced. R. 246 ¶¶ 26, 28. Rather, the new jurisdiction simply calls the old jurisdiction to report that an offender has moved into their jurisdiction and the old jurisdiction transfers ownership of the LEADS file to the new jurisdiction. *Id.*

Law enforcement agencies responsible for recording SORA information are also responsible for verifying that information "at least once per year." 730 ILCS 150/8-5. The statute provides assistance to law enforcement agencies to "locate and apprehend" offenders "who fail to respond to address-verification attempts or who otherwise abscond from registration." *Id.*

## II.     Frederickson's Case

Frederickson began registering as a sex offender in Joliet in 2004. R. 246 ¶ 1. At that time, Detective Moises Avila was responsible for taking SORA registrations

---

[4] "[I]f the offender leaves the last jurisdiction of residence, he or she, must within 3 days after leaving register in person with the new agency of jurisdiction. If any other person required to register under this Article changes his or her residence address, place of employment, [etc.] . . . he or she shall report in person, to the law enforcement agency with whom he or she last registered, his or her new address, change in employment, [etc.] . . . within the time period specified in Section 3." 730 ILCS 150/6.

in Joliet. *Id.* ¶ 2. Frederickson never had a conflict with Detective Avila. *Id.* Detective Avila never refused an update Frederickson reported to his SORA information. *Id.* ¶ 3.

In 2006, Detective Landeros took charge of taking SORA registrations for Joliet. R. 217 ¶ 8. Beginning in 2008, Frederickson began asking Landeros to correct the name of his employer in his SORA registration from "Greg's Auto Body" to "Greg's Body Shop," and to have the registration reflect the fact that he was employed as a contractor. R. 246 ¶ 5. Detective Landeros did not make these changes to Frederickson's registration. *See* R. 209-1 at 52-53 (201:12–204:4).

Frederickson testified that sometime in late 2007 or early 2008 he also informed Detective Landeros that he planned to leave Joliet. According to Frederickson, Landeros responded by threatening to arrest him. *See* R. 209-4 at 24 (300:18–302:4).

On May 15, 2008, Landeros arrested Frederickson and charged him with failure to register. R. 246 ¶ 10. On June 1, 2009, Frederickson was acquitted of this charge. *Id.*

On November 23, 2010, when Frederickson entered the police station to register, Detective Landeros arrested Frederickson on a charge of driving on a suspended license, based on Detective Landeros witnessing Frederickson driving a week earlier. R. 246 ¶¶ 11-12. Detective Avila and another Joliet police officer deposed in this case testified that, although they had made more than 100 arrets for driving on a suspended license, they had never made such an arrest when the

person charged was not actually driving a car at the time of the arrest. *See* R. 209-8 at 32-33 (121:21–122:4);R. 216-5 at 18 (216:3-11).

Frederickson testified that on January 26, 2011, he again told Detective Landeros he planned to leave Joliet and move to Bolingbrook. According to Frederickson, Detective Landeros responded by again threatening to arrest Frederickson. R. 209-4 at 23 (297:1–298:19). Frederickson testified that on February 2, 2011, he wrote "all rights reserved" on his Joliet registration because Detective Landeros had told him that he would be arrested if he attempted to register in any other jurisdiction. R. 209-3 at 17 (59:8-24).

On February 8, 2011, Frederickson applied for a job in Bolingbrook. R. 246 ¶ 18. The next day, he attempted to register at the Bolingbrook Police Department. R. 246 ¶ 19. Bolingbrook accepted his registration form. *Id.* ¶ 20.

Upon receipt of Frederickson's registration form, the Bolingbrook records clerk contacted the Joliet Police Department to request release of Frederickson's LEADS file. R. 246 ¶ 21. Although the records clerk does not remember who she spoke with, her notes indicate that she spoke with Detective Landeros. R. 246 ¶ 22. The records clerk testified that the person she spoke to from Joliet told her that "they knew [Frederickson] was still living in Joliet," and his residence was "under investigation." R. 196 at 18-19 (65:19– 66:1), 38 (145:5-9). The records clerk testified further that Joliet refused to transfer Frederickson's LEADS file to Bolingbrook. R. 196 at 18-19 (65:17–66:1). The Bolingbrook records clerk testified that prior to Frederickson's case she had encountered about 20 instances of the LEADS file for

an offender registered in Bolingbrook being owned by a different jurisdiction, and in every instance the jurisdiction transferred the LEADS file upon request. R. 246 ¶ 26. A Bolingbrook detective and another Bolingbrook administrator responsible for LEADS files also testified that they could not recall a single instance of a jurisdiction refusing to transfer a LEADS file. R. 246 ¶ 28.

Detective Landeros also spoke to a Bolingbrook detective about Frederickson during the time period Frederickson was working in Bolingbrook and attempting to register there. R. 246 ¶ 30. Detective Landeros testified that he "advised Bolingbrook that [Frederickson] was a homeless sex offender employed in Joliet, and . . . his LEADS file belonged to the Joliet Police Department." R. 246 ¶ 24. The Bolingbrook detective testified that Detective Landeros told him that Frederickson was not actually residing in Bolingbrook and was trying to "pull the wool over [Bolingbrook's] eyes," and that Detective Landeros was investigating the situation. R. 246 ¶ 31.

Yet, Detective Landeros also testified that he had no reason to believe that Frederickson was not residing in Bolingbrook, *see* R. 209-1 at 55 (210:15-19);[5] R. 209-2 at 5 (228:23–229:5),[6] and that he could not think of a reason to prevent a

---

[5]    Q:    Did you have any reason to believe that Mr. Frederickson wasn't homeless in Bolingbrook?
       A:    No, I don't.
       Q:    And you didn't have any reason at the time?
       A:    No.

[6]    Q:    You previously testified on the first day of this deposition that you had no reason to believe Mr. Frederickson was not homeless in Bolingbrook, correct?
       [Objection made: "I don't believe he's ever said that."]

LEADS file from being placed into moving status, *see* R. 209-2 at 5 (226:24–227:5).[7]

He also testified that he registers homeless offenders "regardless" of whether the

information they provide is accurate. R. 209-1 at 32 (121:5-14).[8]

After the Bolingbrook detective's conversation with Detective Landeros, an

email was circulated among the Bolingbrook Police Department stating that

Bolingbrook should "not take [Frederickson's] registration due to the fact he lives in

Joliet he is not homeless." R. 246 ¶ 34. The email also claimed that "[Joliet Police

Department] has alerted us to the fact that this guy doesn't want to pay their

mandatory fee so he is going to try and scam us into doing it." *Id.*

Between February 9 and 16, 2011, Frederickson worked in Bolingbrook on

three or four different days and was in the process of moving his belongings from

Joliet to Bolingbrook. *Id.* ¶ 36. On February 16, Frederickson was in Joliet picking

up some of his tools. *Id.* ¶ 37. He was unsure whether he would be able to get a ride

back to Bolingbrook that day, so he registered at the Joliet Police Department that

morning. *Id.* ¶ 37. When he was able to get a ride to Bolingbrook that afternoon,

---

A:     Correct.

[7]   Q:     Have you ever prevented a LEADS file from being placed into a moving status?

A:     No.

Q:     And there's no reason that you would do that, correct?

A:     Yeah, I can't think of one.

[8]   Q:     And if the information they provided on where they had been the previous week was accurate you would register them?

A:     I would register them regardless, it's just whether they're getting arrested for giving the false information.

Q:     Okay. So you would always register them, but if they provided false information you would arrest them?

A:     Correct.

Frederickson also reported to the Bolingbrook Police Department to register. *Id.* ¶ 38. Bolingbrook refused to register Frederickson and ordered him to return to Joliet. *Id.* ¶ 40. Despite Bolingbrook's refusal to register him, Frederickson resided in Bolingbrook from February 16 through 23, living in a truck parked there. *Id.* ¶ 43.

Frederickson again attempted to register in Bolingbrook on February 23. *Id.* ¶ 44. Bolingbrook demanded that Frederickson provide the locations he planned to stay, even though its regulations do not require such information. *Id.* ¶¶ 44-45. When Frederickson declined to provide this information, he was refused registration and told to return to Joliet. *Id.* ¶ 46. Frederickson attempted to file a complaint at Bolingbrook Village Hall. *Id.* ¶ 47. The Clerk refused to accept the complaint and Frederickson was escorted out of the building by Bolingbrook police officers. *Id.* ¶ 49. Frederickson is the only person Bolingbrook has ever refused to register. *Id.* ¶ 41.

Since he was unable to register in Bolingbrook, Frederickson quit his job there. *Id.* ¶ 50. He testified that he then attempted to register in Joliet on February 28, March 1, 2, and 3. Defendants contend that Frederickson appeared at the Joliet Police Department on those days but refused to register. *See* R. 217 ¶¶ 99-102. On March 3, Frederickson was arrested for failing to register. *Id.* ¶ 102. He was convicted on this charge and his conviction was affirmed on appeal. *Id.* ¶¶ 104-05.

**Analysis**

## I.    Detective Scarpetta

As an initial matter, summary judgment is granted in favor of Detective Scarpetta. Frederickson claims he was prevented from registering as a sex offender in Bolingbrook, which eventually led to his arrest when he returned to Joliet. The only allegations against Detective Scarpetta are that he received a grievance from Frederickson about Detective Landeros's conduct during the relevant time period, and that Detective Scarpetta failed to adequately investigate Frederickson's grievance. Even assuming that Detective Scarpetta failed to properly investigate Frederickson's grievance, the Court cannot see how this failure proximately caused the injury at issue in this case, i.e., that Frederickson was prevented from registering in Bolingbrook.

Frederickson's causation theory might be that if Detective Scarpetta had conducted a proper investigation, Detective Landeros might have been prevented from thwarting Frederickson's attempt to register in Bolingbrook. But there is no evidence that Detective Scarpetta intended to prevent Frederickson from registering in Bolingbrook, or that he conspired with Detective Landeros to do so. His failure to conduct an adequate investigation (to the extent that allegation is true) is insufficient evidence for a reasonable jury to find that Detective Scarpetta had such intent. To the extent an inadequate investigation may have contributed to Landeros's ability to violate Frederickson's constitutional rights, that connection is

too attenuated for a reasonable jury to find that Detective Scarpetta has any liability in this case.

Frederickson also alleges that Detective Scarpetta was the person who refused his registration when he first returned from Bolingbrook to register in Joliet on February 28. To the extent Frederickson claims that this alleged refusal violated his due process and equal protection rights, that claim is foreclosed by Frederickson's criminal conviction for failure to register during that particular time period, and his conviction's affirmance on appeal. A finding that Detective Scarpetta improperly refused Frederickson's registration attempt on February 28 would undermine Frederickson's criminal conviction that he was responsible for his failure to register, and such a claim is not cognizable under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994). Therefore, the remaining question in this case is whether a reasonable jury could find that Detective Landeros improperly stymied Frederickson's attempt to register in Bolingbrook in violation of the Due Process or Equal Protection Clauses.

## II.      Detective Landeros

Frederickson alleges that Detective Landeros's conduct violated (1) his substantive due process right to intrastate travel; (2) his procedural due process right to register under SORA; and (3) his right to equal protection of the laws. The Court finds that Detective Landeros is entitled to qualified immunity on Frederickson's substantive and procedural due process claims, so we start there.

## A.    Due Process (Counts I & II)

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). In other words, "[a] state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.*

The Seventh Circuit recently reviewed the standard for determining whether a right is clearly established:

> "To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right . . . ." *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015) (quoting *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013)). "[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

> Plaintiffs need not point to an identical case finding the alleged violation unlawful, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308, (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 741). "[W]e look first to controlling Supreme Court precedent and our own circuit decisions on the issue." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). If no controlling precedent exists, "we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Cleveland-Perdue v. Brutsche*, 881

F.2d 427, 431 (7th Cir. 1989)). In the absence of controlling or persuasive authority, plaintiffs can demonstrate clearly established law by proving that the defendant's conduct was "so egregious and unreasonable that . . . no reasonable [official] could have thought he was acting lawfully." *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 724 (7th Cir. 2013); *see also Jacobs*, 215 F.3d at 767 ("In some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases . . . .").

Before we can determine if the law was clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (alteration in original) (quoting *al-Kidd*, 563 U.S. at 742); *see, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Mullenix*, 136 S. Ct. at 308; *City & County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775-76 (2015). Instead, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). In other words, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Volkman*, 736 F.3d at 1090 ("[T]he Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987))).

*Kemp*, 877 F.3d at 351-52.

### 1.    Substantive Due Process (Count I)

With regard to Frederickson's substantive due process claim, the right to intrastate travel is not clearly established. Although the right to *inter*state travel is

well known, neither the Supreme Court nor the Seventh Circuit have addressed whether *intra*state travel is a fundamental right, *see Mem. Hosp. v. Maricopa Cty.*, 415 U.S. 250, 255-56 (1974); *Schor v. City of Chicago*, 576 F.3d 775, 780 (7th Cir. 2009), and at least one circuit court has held that it is not. *See Wright v. City of Jackson*, 506 F.2d 900, 901-03 (5th Cir. 1975). More recently, some circuits have held that there is such a right. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002) (noting that the right to intrastate travel is "an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function"); *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) ("Though the Supreme Court has dealt only with the right to travel between states, our Court has held that the Constitution also protects the right to travel freely within a single state."). And the Seventh Circuit has cited at least one these cases with implicit approval. *See Doe v. City of Lafayette*, 377 F.3d 757, 771 (7th Cir. 2004) (citing *Johnson*). This authority is sufficiently varied and uncertain that the Court cannot find there was an established right to intrastate travel during the relevant time period. Therefore, the Court finds that Detective Landeros has qualified immunity on Frederickson's substantive due process claim, and the Court grants summary judgment to Detective Landeros on Count I.

### 2.    Procedural Due Process (Count II)

To prevail on a procedural due process claim, a plaintiff must demonstrate a protected liberty or property interest. Frederickson argues that he has a liberty interest in registering under SORA. Detective Landeros does not dispute this, but

argues that Frederickson did not have "a right to register where he wanted to register . . . without having to first 'register out' of Joliet." R. 208 at 12. While SORA does impose a requirement to "register out," as Defendants put it, there is evidence that this requirement is not enforced as long as the offender reports for registration in his new jurisdiction. The testimony in the case shows that law enforcement agencies in an offender's old jurisdiction always comply with a request from the law enforcement agency in the new jurisdiction to transfer the LEADS file even when the offender failed to "register out." Moreover, SORA provides a three-day grace period to "register out," and there is genuine question of fact as to whether the three days were up when Detective Landeros convinced Bolingbrook to block Frederickson's registration. There is also a genuine question of fact as to whether Frederickson attempted to "register out," as he testified that he told Detective Landeros he planned to move out of Joliet, to which Detective Landeros responded with a threat of arrest.

Courts in this district have held that preventing a homeless offender from registering under SORA constitutes a procedural due process violation. *See Derfus v. City of Chicago*, 42 F. Supp. 3d 888 (N.D. Ill. 2014); *Saiger v. City of Chicago*, 37 F. Supp. 3d 979 (N.D. Ill. 2014); *Johnson v. City of Chicago*, 2016 WL 5720388 (N.D. Ill. Sept. 30, 2016). However, those cases were decided after the events in this case occurred, and those courts held that the liberty interest in registering under SORA was not clearly established during the relevant time period. Frederickson concedes

as much. *See* R. 215 at 37 ("[T]he right of a Homeless Offender to register under SORA was [not] 'clearly established' as of February 2011[.]").

Frederickson also argues that "Defendants' conduct, motivated by ill will, in placing Frederickson in legal jeopardy by refusing to allow him to register without any rational purpose in doing so" is "patently violative" of Frederickson's rights, such that qualified immunity is not appropriate. R. 215 at 37. But procedural due process is not concerned with the defendant's motivation.[9] And neither is qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982) ("[W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) ("*Harlow* purged qualified immunity doctrine of its subjective components, meaning that the defendants' actual state of mind or knowledge of the

---

[9] In analyzing a procedural due process claim, the Court must determine (1) whether the plaintiff was deprived of a constitutionally protected liberty or property interest, and (2) how much process was due. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Next, to determine how much process is due, the Court "must balance three factors: '[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Schepers v. Comm'r, Ind. Dep't of Corr.*, 691 F.3d 909, 915 (7th Cir. 2012) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)). The defendant's motive is not relevant to any of these elements.

law is irrelevant to whether the asserted conduct would have been legally reasonable."). To the extent motive is a part of the equation in this case, it must be relevant to whether the evidence is sufficient for a reasonable jury to find that Detective Landeros committed a constitutional violation. As is discussed further below, motive or "personal animus" is relevant to the elements of Frederickson's equal protection claim. But it is not relevant to the elements of Frederickson's due process claims, and is not relevant to whether the due process rights at issue in those claims were clearly established or the alleged conduct was "patently violative" of the plaintiff's constitutional rights.

Therefore, the Court holds that Detective Landeros is entitled to qualified immunity on Frederickson's procedural due process claim, and grants summary judgment to Detective Landeros on Count II.

### B.      Equal Protection (Count III)

As discussed, the Court holds that the rights at issue in Frederickson's due process claims were not "clearly established" during the relevant time period. This holding is dispositive of those claims without the need for a determination on the merits of whether Detective Landeros violated Frederickson's due process rights. As is discussed below, however, the Courts holds that Frederickson's equal protection right to "police protection uncorrupted by personal animus" is clearly established. *See Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009). Thus, it is necessary to first address whether a reasonable jury could find that Detective Landeros violated that right.

### 1. Merits

Frederickson claims that Detective Landeros violated his equal protection rights by thwarting his attempt to register in Bolingbrook. The Equal Protection Clause of the Fourteenth Amendment provides that, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has said that this "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, plaintiffs usually show that they are members of a "suspect class" or that they were denied a "fundamental right." *Srail v. Village of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). In the absence of either scenario, however, a plaintiff can show that the defendant discriminated against the plaintiff in particular—a so called "class-of-one" claim—which require the plaintiff to show that "the plaintiff has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment." *Id.* To make such a showing, the "plaintiff must negate any reasonably conceivable state of facts that could provide a rational basis." *Jackson v. Village of Western Springs*, 612 Fed. App'x. 842, 847 (7th Cir. 2015). Whether the plaintiff has succeeded in proving that no "reasonably conceivable state of facts" exists is a question for the jury. *See Knaus v. Town of Ledgeview*, 561 Fed. App'x 510, 514 (7th Cir. 2014); *RJB Props., Inc. v. Bd. of Educ. of City of Chi.*, 468 F.3d 1005, 1010 (7th Cir. 2006).

Detective Landeros contends that his actions were reasonable because it was his:

> obligation . . . to keep track of [Frederickson's] whereabouts. If [Frederickson] could register in Bolingbrook one week, Downers Grove the next, and Peoria the following week, all because he lacks a fixed residence, without ever notifying the agency charged with jurisdiction over him as to his whereabouts, the purpose of the statute would be defeated.

R. 208 at 18. On the basis of this logic, Detective Landeros appears to argue both that (1) he had a duty to prevent Frederickson from registering in Bolingbrook because he believed Frederickson continued to reside in Joliet, *see* R. 235 at 7 ("Landeros only delayed the immediate transfer of jurisdiction over plaintiff's LEADS file because of suspicions over the legitimacy of plaintiff's move to Bolingbrook."); and (2) Frederickson's failure to "register out" of Joliet before moving to Bolingbrook was the real reason he wasn't able to register in Bolingbrook, *see* R. 235 at 14 ("[P]laintiff had the keys to any registration problem he faced . . . . In light of plaintiff's own failure to register out of Joliet within three days of registration in Bolingbrook, Landeros'[s] follow-up investigation certainly was rational."). Neither argument is sufficient to support summary judgment in Detective Landeros's favor.

First, Detective Landeros cites no authority supporting his contention that he was under an obligation to investigate Frederickson's residence prior to transferring ownership of his LEADS file to Bolingbrook. Although law enforcement agencies are tasked with verifying the information reported by offenders, the statute requires

only that this verification occur "at least once a year." Nothing in the statute required Detective Landeros to verify the particular report Frederickson made to Bolingbrook. Further, Detective Landeros's argument that he was required to investigate contradicts his own testimony that he had no reason to question Frederickson's report of residence in Bolingbrook. Additionally, an offender has a three-day grace period to report new addresses. There is a genuine question of fact as to whether Frederickson was in violation of this requirement, such that an investigation would be warranted. In general, there is a question of fact regarding whether Frederickson was attempting to evade the registration requirements. Rather than indicating evasion, the evidence tends to show that Frederickson was continually providing information to both Joliet and Bolingbrook about where he was residing and working.

Nevertheless, rather than simply recording Frederickson's reports, Detective Landeros took it upon himself to confirm Frederickson's residence. This quest then led Landeros to refuse to transfer Frederickson's LEADS file and to convince Bolingbrook to refuse Frederickson's registration. Based on this evidence, a reasonable jury could find that there is no rational explanation for Detective Landeros to refuse to transfer ownership of Frederickson's LEADS file and otherwise advise Bolingbrook not to register him, such that Landeros violated Frederickson's equal protection rights.

Second, Detective Landeros cites no authority supporting his contention that Frederickson's failure to "register out" from Joliet was a basis to prevent him from

registering in Bolingbrook or threaten him with arrest. Although SORA requires an offender to report a change in residence to his prior registering law enforcement agency, Bolingbrook officials testified that this requirement is regularly unenforced as long as the offender presents himself for registration in the new jurisdiction. Even Detective Landeros testified that he normally does not refuse a request to transfer LEADS files or to register offenders who report. In any case, Frederickson testified that he told Detective Landeros that he planned to move out of Joliet and that Detective Landeros responded by threatening to arrest him. Whether or not Detective Landeros threatened to arrest Frederickson, it is clear that Detective Landeros decided not to believe Frederickson's assertion of his intent to move. Having rejected Frederickson's attempt to report his move, Detective Landeros cannot now claim that his efforts to prevent Frederickson's registration in Bolingbrook were justified by Frederickson's failure to withdraw from Joliet. A jury could reasonably find that Frederickson acted reasonably by leaving Joliet to attempt to register in Bolingbrook and avoid Detective Landeros's irrational application of SORA.

Additionally, SORA's requirement to report a move is largely implicated here only because Frederickson is homeless. Joliet and Bolingbrook are only about 15 miles apart. A person with a permanent residence in that area, who also owned a car, easily could leave a job in Joliet and take a job in Bolingbrook without the need to change residences, and register such a change under SORA. But since Frederickson is homeless, his "residence" essentially travels with him, such that

any change in his personal circumstances triggers greater SORA reporting requirements than for an offender with a permanent residence. And more pertinent to the facts of this case, a change in residence also triggers the need to transfer ownership of a LEADS file, whereas a change in employer does not. Given the evidence that law enforcement agencies normally do not enforce the "register out" requirement, a reasonable jury could find that Detective Landeros should have been cognizant of this circumstance and should have been satisfied with Frederickson's attempt to register in Bolingbrook despite his failure to "register out" of Joliet.

Detective Landeros also argues that Frederickson's equal protection claim must fail because Frederickson has failed to allege a similarly situated "comparator" who was treated differently than Frederickson—i.e., a homeless offender who failed to register out of Joliet whose LEADS file was nevertheless transferred to the new law enforcement agency having jurisdiction. "Normally, a class-of-one plaintiff will show an absence of rational basis by identifying some comparator—that is, some similarly situated person who was treated differently." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015). But, "[i]f animus is readily obvious, it seems redundant to require that the plaintiff show disparate treatment in a near exact, one-to-one comparison to another individual." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (reversing a grant of summary judgment to defendants on a class-of-one equal protection claim for lack of comparator evidence); *see also Geinsoky v. City of Chicago*, 675 F.3d 743, 748 (7th Cir. 2012) ("But in this case, requiring [the plaintiff] to name a similarly situated

person who did not receive twenty-four bogus parking tickets in 2007 and 2008 would not help distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection. Such a requirement would be so simple to satisfy here that there is no purpose in punishing its omission with dismissal. Here, the pattern and nature of defendants' alleged conduct do the work of demonstrating the officers' improper discriminatory purpose."). As discussed, Frederickson has shown that a request for transfer of a LEADS file is not normally rejected; that the requirement to first register out of an old jurisdiction before registering in a new jurisdiction is not enforced; and Detective Landeros testified that he had no reason to question Frederickson's report of residence in Bolingbrook. This is strong enough evidence of irrational conduct such that comparator evidence is not required to deny summary judgment on Frederickson's equal protection claim.

There is an open question as to whether a class-of-one plaintiff must also prove that the defendants acted with personal animus or malice in treating the plaintiff differently. *See Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012). The Court need not take a side on that dispute, however, because in this case Frederickson must prove that Landeros acted out of personal animus against him; otherwise, Landeros's conduct is protected by qualified immunity.

### 2.    Qualified Immunity

In the context of class-of-one equal protection claims like Frederickson's, the Seventh Circuit has held that the right to "police protection uncorrupted by

personal animus" is clearly established. *Hanes*, 578 F.3d at 496 (citing *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) ("If the police decided to withdraw all protection from [the plaintiff] out of sheer malice, or because they had been bribed by his neighbors, he would state a claim . . . .")). Thus, qualified immunity is unavailable to a police officer who "deliberately sought to deprive [a plaintiff] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Hilton*, 209 F.3d at 1008.

Here, the evidence is sufficient for a reasonable jury to find that Detective Landeros was motivated by personal animus towards Frederickson when he stymied his attempt to register in Bolingbrook. There is evidence that Detective Landeros had a history of conflict with Frederickson. Detective Landeros also testified that he had no reason to believe that Frederickson was not residing in Bolingbrook when he sought to register there, leading to the inference that Detective Landeros's motivations were personal. Furthermore, there is evidence that Detective Landeros's actions were extraordinary. No homeless offenders in Joliet or Bolingbrook have ever been denied transfer of their LEADS file. Additionally, unlike in Frederickson's case, the requirement that an offender report to his former residential jurisdiction that he has moved is generally waived once the new jurisdiction requests transfer of the LEADS file. Because this evidence is sufficient for a reasonable jury to find that Landeros acted with personal animus towards Frederickson, summary judgment based on qualified immunity is not appropriate at this time. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir.

2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial.").

In sum, Detective Landeros's contention that his decisions to prevent the transfer of Frederickson's LEADS file and to tell Bolingbrook not to register Frederickson, were justified because Frederickson failed to register out of Joliet, rings hollow. The evidence here is sufficient for a reasonable jury to conclude that Detective Landeros took the actions he did out of personal animus towards Frederickson that developed over time out of his frustration with his experiences taking Frederickson's registrations. Therefore, Landeros's motion for summary judgment on Frederickson's equal protection claim is denied.[10]

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. It is granted as to the claims against Scarpetta, and Counts I, II, IV, and V against Landeros. It is denied as to Count III against Landeros. A status hearing is set for March 21, 2018, at which time the parties should be prepared to set a trial date.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: March 7, 2018

---

[10] Since Detective Landeros is the only remaining defendant, and the Court has denied his motion for summary judgment on the claims underlying the conspiracy counts, Frederickson's conspiracy claims are superfluous and are dismissed.